Susan J. BENNETT, Scott Brown, Diane Dunbar, Tony Galante, James Haughie, John Hoegl, Lauren Kurowski, Robert Leases, Thaddeus Lelek, John L. Macdonald, Ruth Rhodes, Robert Richardson, Rosalie Ritorto, Martha Sampedro, John Seminara and Robert Smith, Plaintiffs,

v.

GILL & DUFFUS CHEMICALS, INC., Defendant.

No. 85 CIV 4119 (LBS).

United States District Court, S.D. New York.

Nov. 10, 1988.

Pollner, Mezan, Stolzberg, Berger & Glass, P.C., New York City, for plaintiffs; Andrew Berger, Steven J. Gombinski, Lisanne P. Davidson, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Mark H. Alcott, Jeh C. Johnson, of counsel.

## OPINION

SAND, District Judge.

This action was brought by sixteen former employees of defendant Gill & Duffus Chemicals, Inc. ("Chemicals") to recover severance benefits allegedly owed under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). Chemicals has asserted eight counterclaims, most of which are contingent on a finding of liability against the corporation.

This Court held on December 29, 1987 that an ERISA severance benefit plan existed at Chemicals at the time the plaintiffs stopped working for Chemicals in 1983 and began working for a successor company that had purchased Chemicals' assets. The action was remanded to Chemicals' plan administrator to determine whether the plaintiffs were entitled to benefits based on their severance from Chemicals. On May 10, 1988, the plan administrator denied severance benefits to fourteen of the sixteen plaintiffs.[1] The issue now before the Court is whether the plan administrator's decision should be overturned.

The parties agreed to try the action based on a record of stipulated facts and exhibits, trial briefs and oral argument. Based on that procedure, and pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law.

## BACKGROUND

Chemicals was formed in 1977 as a division of Gill & Duffus, Inc. and separately incorporated in 1978. Following corporate restructuring, Gill & Duffus Holdings, Inc.

became the sole owner of Chemicals in 1982. The present action stems from the sale of Chemicals' principal assets to Steuber Company, Inc. ("Steuber") in March 1983. At issue is the plan administrator's recent determination that Chemicals' severance benefit plan at the time of Steuber's purchase of Chemicals' assets did not require that severance payments be made to plaintiffs.

The earlier proceeding before this Court considered whether Chemicals had an ERISA severance benefit plan. Plaintiffs claimed that Chemicals—even if it never had a written severance policy—consistently paid severance benefits to terminated employees. Chemicals asserted that it had no severance plan and thus owed no severance pay. On December 29, 1987, this Court held that an ERISA severance plan existed at Chemicals in fact if not in writing. The Court concluded:

> [W]e construe the evidence to demonstrate the company's intent to compensate employees for the loss of their positions.
>
> The class of beneficiaries appears to be those employees who were involuntarily terminated for reasons other than cause. The evidence shows that all such employees who were terminated from their jobs before 1983 received benefits of at least [one month's salary per year of service for managerial employees and two weeks' salary per year of service for secretarial employees]. Therefore, we reject the defendant's claim that the payments were *ad hoc.*

Op. at 8–9. The action was remanded to the plan administrator to consider plaintiffs' severance benefits claims in light of the Court's holding.

On May 10, 1988, R.M. Swinchatt, the current president of Chemicals, issued a report on the severance claims. Swinchatt concluded that plaintiffs Bennett and Seminara are entitled to severance pay based on the fact that they were not offered contin-

---

1. Two of the plaintiffs, Susan J. Bennett and John Seminara, were granted the severance benefits they sought. Therefore, unless otherwise noted, references to "plaintiffs" in this opinion shall refer to the fourteen plaintiffs who were denied severance benefits on May 10, 1988.

ued employment in the same positions they held before the sale to Steuber. Bennett, who had been office manager of Chemicals' Princeton office, was offered a job at Steuber's New York City office. Seminara was offered a different job in a different office with a different division of Gill & Duffus. In calculating the amount of severance pay due Bennett and Seminara, Swinchatt found that Chemicals, prior to the sale to Steuber, paid departing employees varying amounts of severance pay. Although Swinchatt was unable to find a pattern in the level of the prior severance payments, he accepted the testimony of plaintiff and former Chemicals president John L. Macdonald that there was "a specified minimum payment" of one month's salary per year of service for managerial employees and two weeks' salary per year of service for secretarial employees.[2] *See* Determination of Severance Payment Due to Sixteen Former Employees of Gill & Duffus Chemicals, Inc. ["Swinchatt Determination"]. In view of this finding by the plan administrator and the prior holding of this Court, the only remaining issue concerns to whom severance benefits are owed. The parties now agree—and the Court previously found—that Chemicals paid an established minimum level of severance benefits to those it determined were owed severance pay.

As to the other fourteen plaintiffs, Swinchatt found that they "have no entitlement to severance pay" because Chemicals "had taken steps to establish that these departing employees were going to receive the benefit of continuing employment in similar jobs within the same or similar office." Swinchatt Determination at 3. He also noted that Chemicals had paid the plaintiffs an entire year's vacation pay even though they were only entitled to the vacation pay that had accrued in the first two-and-a-half months of the year when the company was sold in mid-March 1983.[3]

Following Swinchatt's rejection of the plaintiffs' severance claims, the action was brought back before this Court. The present dispute centers on Swinchatt's determination of the scope of the unwritten policy's involuntary termination provision and, specifically, whether it covered the plaintiffs' change in employer from Chemicals to Steuber. The parties have stipulated that "[e]very plaintiff ... commenced employment with Steuber on March 16, 1983 at the same position, with at least the same salary, and with substantially the same responsibilities as he or she had with Chemicals." Pre–Trial Order ¶ 3(a)(24). In addition, "[n]o plaintiff who accepted employment with Steuber was unemployed between employment with Chemicals and employment with Steuber." Pre–Trial Order ¶ 3(a)(39). Plaintiffs' argument rests on the contention that they "are entitled to severance because they were involuntarily terminated. The fact that plaintiffs suffered no job loss is irrelevant since ... the Plan was not intended to compensate for loss of employment." Plaintiffs' Post–Trial Reply Brief at 2. Chemicals, on the other hand, contends that "the Court should [not] second-guess an employer's decision not to pay severance to employees who were never severed, but who continued in their existing jobs without interruption." Defendant's Post–Trial Brief at 1.

## DISCUSSION

### 1. Standard of Review

■ In the first place, the parties disagree as to the proper standard this Court

---

**2.** On page three of his severance determination, Swinchatt stated that the minimal level of severance for secretarial employees was one week's salary for every year of service; however, this was an error. Both Macdonald's testimony and this Court's finding, which Swinchatt relied on, stated that secretarial employees received two weeks' salary for every year of service. In addition, Swinchatt's award of three weeks' salary to Bennett, who had worked at Chemicals for a year and a half, corresponds to the higher level.

**3.** Swinchatt referred to this payment as "the appropriate level of severance payment." Swinchatt Determination at 3. However, the parties have stipulated that "[n]one of the plaintiffs were paid severance by Chemicals." Pre–Trial Order at ¶ 3(a)(25). In addition, Chemicals concedes that the payment was strictly vacation pay. Defendant's Post–Trial Brief at 46. Accordingly, contrary to Swinchatt's conclusion, the Court does not recognize the payment of excess vacation pay as a form of severance pay.

should apply in reviewing the plan administrator's decision. In ERISA cases, the reviewing court traditionally is limited to determining whether the plan administrator's decision was arbitrary and capricious. *See, e.g., Schwartz v. Newsweek, Inc.*, 827 F.2d 879, 882 (2d Cir.1987) ("Under ERISA, the issue is not the precise meaning of the [severance policy], but whether [the] denial of severance benefits to plaintiffs was arbitrary and capricious."). The court's role is to decide whether the decision "was made rationally and in good faith—not whether it was right." *Riley v. MEBA Pension Trust*, 570 F.2d 406, 410 (2d Cir.1977). "[T]he limited standard of review applied in these cases mean[s] that the trial court should not conduct a *de novo* hearing on a rejected applicant's eligibility for benefits or disregard [an administrator's] reasonable interpretation of plan provisions." *Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir.) (citation omitted), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983).

However, plaintiffs urge this Court to reject the arbitrary and capricious standard and to apply instead the contract construction test adopted by the Third Circuit in *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134 (3d Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1288, 99 L.Ed.2d 498 (1988). Plaintiffs argue that Swinchatt's determination is not entitled to the deference afforded by the arbitrary and capricious standard because of his partiality. *See* Plaintiffs' Post–Trial Brief at 9–14.

The Court finds that it is not necessary to deviate from traditional ERISA analysis because the arbitrary and capricious standard provides a sufficiently flexible mechanism by which we can review the plan administrator's decision. *See, e.g., Sage v. Automation, Inc. Pension Plan and Trust*, 845 F.2d 885, 895 (10th Cir.1988) ("the arbitrary and capricious standard is sufficiently flexible to allow a reviewing court to adjust for the circumstances alleged"); *Simmons v. Diamond Shamrock Corp.*, 844 F.2d 517, 522 (8th Cir.1988) (upholding the district court which, "while os-

tensibly applying the arbitrary and capricious standard, in fact employed a stricter standard in its rigorous scrutiny of the plan administrator's action"); *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1053 (7th Cir.1987) ("Flexibly interpreted, the arbitrary and capricious standard, though infelicitously—perhaps even misleadingly—worded, allows the reviewing court to make the necessary adjustments for possible bias in the trustee's decision. So there is no urgent need to throw it overboard and cast for an alternative verbalization.").

In applying the arbitrary and capricious standard in this action, the Court will take into account the fact that Chemicals avoided a significant payment when it rejected the claim made against the unfunded severance plan. As explained in *Jung v. FMC Corp.*, 755 F.2d 708, 711 (9th Cir. 1985): "Where, as here, the employer's denial of benefits to a class avoids a very substantial outlay, the reviewing court should consider that fact in applying the arbitrary and capricious standard of review. Less deference should be given to the trustee's decision." We cannot ignore completely Chemicals' interest in denying the payment when that fact could reflect on whether the denial was made in good faith.

We are also particularly mindful of the plan administrator's procedural violations in implementing the severance policy. Chemicals concedes, as it must, that it gave employees no notice or description of the severance benefit plan. Defendant's Trial Brief at 47. Its actions were in violation of ERISA's reporting and disclosure requirements (29 U.S.C. § 1021 *et seq.*) and claims procedure requirements (29 U.S.C. § 1133). This neglect of Chemicals' officers, some of whom are now in the incongruous position of being plaintiffs in this action, caused other employees the type of harm ERISA specifically sought to prevent. As we noted in our prior opinion, the general purpose of ERISA is to protect workers from abuses in the administration and investment of private employee welfare and retirement

plans.[4] *See generally* H.R.Rep. No. 93–533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639. Chemicals' workers could not protect themselves from abuses in the administration of their severance plan when they were unaware of its terms and, indeed, of its very existence.

The court in *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), faced a similar situation where an employer flagrantly violated ERISA requirements by keeping its written severance policy secret from its employees. The *Blau* court, while adhering to the arbitrary and capricious standard, explained:

> When procedural violations rise to the level that they have in this case, they alter the substantive relationship between employer and employee that disclosure, reporting and fiduciary duties sought to balance somewhat more equally. The quantity of defendants' procedural violations may then work a substantive harm. Thus, in reviewing an administrator's decision, a court must consider continuing procedural violations in determining whether the decision to deny benefits in a particular case was arbitrary and capricious.

748 F.2d at 1354. *See also Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1499 (11th Cir.1987) (following *Blau* in situation where employer failed to give most employees plan description and failed to set up claims procedure).

Accordingly, the Court will apply the arbitrary and capricious standard to the plan administrator's determination while taking into account all the circumstances surrounding the denial of severance benefits.

## 2. The So–Called "Sale of Business Rule"

■ Chemicals contends that Swinchatt rejected plaintiffs' severance claims for "the simple reason they were never severed." Transcript of Oral Argument, Sept. 7, 1988 ("Transcript") at 26. Case law, however, is contrary to that position. Courts have consistently recognized that in a sale-of-business situation, employees are severed from their old employer and then, perhaps, rehired by the new employer. *See, e.g., Harris v. Pullman Standard, Inc.*, 809 F.2d at 1498 ("[T]he sale of a division in the corporation terminated the employer-employee relationship, even though the employees retained their jobs under the new owner."); *Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320, 325 (2d Cir.1985) ("When ties that bind an employee to his or her company are severed by the employer, unemployment for the employee—whether fleeting or permanent—is an inexorable consequence."), *aff'd mem.*, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986); *Jung v. FMC Corp.*, 755 F.2d 708, 712–13 (9th Cir.1985) ("We must acknowledge that a termination of the employment relationship with FMC occurred" even though employees continued in their jobs with new employer); *Blau v. Del Monte Corp.*, 748 F.2d at 1354–55 ("[W]e cannot deny that jobs are eliminated—and then, perhaps, reinstated—when one employer succeeds another").

Chemicals also argues that if the employees were severed, they are not entitled to severance pay because they did not suffer job loss: "[T]he evidence in this case, ERISA law, and the common understanding of severance all suggest that job loss is a prerequisite for severance pay." Defendant's Post–Trial Brief at 34. Chemicals thus contends that the Court should uphold Swinchatt's determination under the "sale of business rule,"[5] which holds that

---

**4.** 29 U.S.C. § 1001 states the policy behind ERISA:

> [O]wing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the estab-

lishment, operation, and administration of [employee benefit] plans....

**5.** Among the many references Chemicals has made to the "sale of business rule" are the following: "An ever expanding line of 'sale of business' cases ... all hold that the Court should not [overturn the plan administrator's decision]." Defendant's Post–Trial Brief at 1. "The 'sale of business' cases ... clearly apply." *Id.* at

"employees are not entitled to severance when they continue in their same jobs with a new employer." Defendant's Post–Trial Brief at 4. Chemicals' reliance on this doctrine is misplaced. Although courts have upheld the denial of benefits in several cases involving sale-of-business situations, there is no "sale of business rule" *per se.*

Chemicals cites *Sly v. P.R. Mallory & Co.,* 712 F.2d 1209 (7th Cir.1983), and *Jung v. FMC Corp., supra,* as the "leading cases" in support of the rule. Defendant's Post–Trial Brief at 23. However, those cases, and many of the others Chemicals relies on, are inapposite. The *Sly* court, which affirmed the district court's award of summary judgment to defendants, based its decision on Mallory's written severance policy that *"clearly* anticipates the recipient of the severance claims to be without employment." 712 F.2d at 1211 (emphasis added). For that reason the court found that the payment of benefits would result in a windfall to the employees. The *Jung* court similarly concluded that "the *clear language* of [FMC's] plan does not mandate the payment of severance benefits upon divestiture and transfer of employees, at least where FMC has made the arrangement made with buyer here." 755 F.2d at 713 (emphasis added). The arrangement referred to was an agreement by the buyer to continue to provide a severance benefit plan that accorded full credit for past service to the former employer. Because there was no clear language in the severance policy in the instant action—indeed, there was *no* language in Chemicals' severance policy—and no agreement between Chemicals and Steuber to protect the employees' accrued benefits, it cannot be said that *Sly* and *Jung* support Chemicals' claim that the "sale of business rule" requires the Court to uphold the denial of benefits here.

Several other cases cited by Chemicals similarly were decided on the basis of specific written policy language that did not anticipate severance payments when employees retained their jobs. *See, e.g., Ac-*

*cardi v. Control Data Corp.,* 836 F.2d 126 (2d Cir.1987) (separation policy was described in IBM's Managers' Manual); *Schwartz v. Newsweek, Inc.,* 827 F.2d 879 (2d Cir.1987) (severance benefit policy was stated in Newsweek's Supervisor's Manual); *Anderson v. Ciba–Geigy Corp.,* 759 F.2d 1518 (11th Cir.), *cert. denied,* 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985) (termination policy was described in Ciba–Geigy's Employee Benefit Plan). This Court's task would be much simpler if Chemicals had complied with the requirements of ERISA and provided written documentation of its severance policy. In the absence of that, the Court will not reward the errant plan administrators with immunity under a so-called "sale of business rule."

At best, the sale-of-business cases hold that employees are not entitled to severance pay unless a plan provides for it. But that proposition goes without saying, for there is nothing in the law that entitles employees to severance benefits at all. What is at issue here, however, is plaintiffs' contention that they are entitled to severance benefits under the terms of the severance plan that actually existed at Chemicals. And that cannot be written off by ignoring the plan and pointing to a "sale of business rule."

In addition, we must note that severance benefits serve two purposes. Severance pay can be given to reward past service to a company as well as to provide protection against future unemployment. The Second Circuit recognized this dual function in *Gilbert v. Burlington Industries, Inc., supra,* in the course of deciding that state law is preempted by ERISA. Burlington had sold a division to a buyer who retained all the employees in their same jobs, and the employees brought suit under the provision of the severance policy that provided for benefits to those "involuntarily terminated" from the company. Discussing the purpose of severance pay, the court noted that "severance pay is often a reward for past

---

4. "This 'sale of business' rule applies squarely to the facts of this case." *Id.* at 26. "The sale of business rule clearly applies." *Id.* at 38. "[A]

body of case law that is truly overwhelming in its scope ... upholds the so-called sale of business rule." Transcript at 34.

service." 765 F.2d at 325. *Cf. Local 879, Allied Industrial Workers of America v. Chrysler Marine Corp.*, 819 F.2d 786, 788 (7th Cir.1987) (court's review of arbitrator's award of severance pay noted that "while one purpose of severance pay is to provide income between jobs, it also compensates employees for their service and for termination for reasons unrelated to their conduct").

Accordingly, Chemicals' reliance on a so-called "sale of business rule" is of little value. The Court must review the plan administrator's decision to deny benefits in light of the plan itself.

### 3. Chemicals' Severance Benefit Policy

There is little evidence as to the exact scope of the severance benefit plan that existed at Chemicals. We know that severance was paid routinely to all employees who were terminated without cause, but it is difficult to discern the intended limits of that policy. Not only were Chemicals' employees kept in the dark by the company's failure to abide by ERISA's requirements, but so were many of its corporate officers.

Plaintiffs' claim for severance pay is based on the following understanding of Chemicals' policy:

> Every employee who was involuntarily terminated for reasons other than the employee's performance was entitled to severance. There were no exceptions. The severance was to be paid regardless of whether the employee had immediate employment after termination. Under the Plan, severance was never intended to be a substitute for unemployment compensation; nor was severance ever conditioned on unemployment.
>
> . . . .
>
> Severance was paid in recognition of the contribution made to Chemicals by the terminated employee.

Macdonald Affidavit II at ¶ 5(i).

Chemicals, on the other hand, argues that the plan was intended to compensate employees only in the event of unemployment: "[T]he 'plan' in the present case contains no express provision identifying severance as compensation for past services. The plan was unwritten. Whatever evidence there is of the plan's intent suggests it was designed to compensate for job loss and disruption." Defendant's Post–Trial Brief at 29.

Although the parties disagree over whether the plan was unemployment-based, they agree about the basic substance of discussions that took place around the time of the sale of assets to Steuber. Colin Tant, who served as president of Chemicals' parent company during the relevant time period, stated:

> I made the decision to deny plaintiffs severance pay. This decision was made in conjunction with the decision to grant severance pay to those employees plaintiff MacDonald [sic] decided to terminate as part of Chemicals' liquidation. The rationale for my decision was simple: the employees MacDonald terminated were losing jobs they previously had with Chemicals, while the plaintiffs were going to be guaranteed employment with Steuber.
>
> . . . .
>
> [When Macdonald first asked Tant about severance pay for the employees] I told MacDonald that Chemicals should pay severance only to those he intended to terminate. I thought this arrangement was fair. Those whom Mr. MacDonald selected to be terminated would face the dislocation and inconvenience of seeking and taking on new positions, even if they were fortunate enough to obtain such positions immediately. . . . [The plaintiffs] were being guaranteed continued employment in the same jobs with Steuber. Mr. MacDonald did not object to this arrangement.
>
> . . . . Mr. MacDonald did *not* say to me at that time that severance to the plaintiffs was required by any plan, program or policy at Chemicals.

Tant Affidavit at ¶¶ 3, 7, 8.

Macdonald stated that he and Tant did not discuss severance benefits for the remaining employees:

> In connection with [mid-January 1983 discussions about the asset sale] Mr. Tant told me to divide the approximately

30 employees still at Chemicals into two groups: those I would be taking with me in a purchase of assets and those that I would not.

Mr. Tant said that Chemicals would pay severance to those persons I was not taking. He did not say that Chemicals would not pay severance to those employees I was taking with me.

Macdonald Affidavit at ¶¶ 18, 19.

Tant's explanation of his denial of benefits to plaintiffs is in conflict with several significant pieces of evidence. In the first place, Chemicals' argument is predicated on the fact that the plaintiffs are distinguishable from other employees who were severed from Chemicals because their employment was never terminated. As Tant explained: "The rationale for my decision was simple: the employees MacDonald terminated were *losing jobs they previously had with Chemicals*, while the plaintiffs were going to be guaranteed employment with Steuber." Tant Affidavit at ¶ 3 (emphasis added). This explanation ignored a basic fact: *all* employees of Chemicals—including the plaintiffs, who chose to work for Steuber—ended up "losing jobs they previously had with Chemicals." The only thing that distinguished plaintiffs from the employees who were previously let go was the date of their termination from Chemicals.

The evidence also illustrates that, prior to the consideration of plaintiffs' severance claims, Chemicals' policy was not conditioned solely on unemployment. Chemicals paid severance to involuntarily terminated employees regardless of their subsequent employment status. The record contains affidavits from several former employees who were given severance benefits in spite of the fact that they did not miss any work. *See, e.g.,* Affidavits of William Daly (employed at Merona, Inc. immediately following termination on January 21, 1983); Stephen Ridding (employed at ICC Industries, Inc. immediately following termination on January 21, 1983); Carmella Moriello (employed at Helmsley Spear, Inc. immediately following termination on January 21, 1983). At the time payments were made to these employees, Chemicals' management did not complain, as it does now, that the severance payments represented a "windfall" to employees who did not suffer a period of unemployment.

Chemicals' treatment of other employees also reflects on its treatment of plaintiffs. Bennett and Seminara, plaintiffs in this action, had their claims rejected by the management of Chemicals for no rational reason. Although Bennett was offered a job at a different location and Seminara was not offered a job at all with Steuber, both were denied severance pay. Chemicals' arbitrary behavior toward Bennett and Seminara—and the fact that it took the company five years to recognize that they deserve severance benefits under any definition of the policy—is indicative of the treatment given the group of employees who were terminated from Chemicals on March 15, 1983.

Not only was Chemicals' denial of benefits to some employees at the time of the asset sale to Steuber inconsistent with its current explanation of its severance policy, but so was its granting of a benefit. Although Anthony Craske, an employee of Chemicals' Canadian subsidiary, accepted employment with Steuber and was not unemployed following the asset sale, he was paid severance. Craske Affidavit at ¶¶ 6–7; Macdonald Affidavit at ¶ 43. Chemicals' attempt to distinguish Craske's situation as having been required by Canadian employment law is unavailing. Under Canadian law, Craske was entitled to merely one week's notice of his termination or, in the alternative, one week's salary. *See* Affidavit of Robert Rose. Based on his 21 months of service as a managerial employee at Chemicals, Craske received, in fact, the equivalent of three months' salary. Craske Affidavit at ¶ 4. A company's prior history in a sale-of-division situation is an important factor for a court to consider in determining the company's severance policy. *Sly v. P.R. Mallory & Co.,* 712 F.2d at 1213. Chemicals' only history indicates that the company paid severance in spite of the employee's subsequent employment with the purchasing company. The distinction Chemicals

made between Craske and other employees terminated on March 15, 1983 is further evidence of its disparate treatment of the plaintiffs.

The Court thus finds that, prior to March 15, 1983, it was Chemicals' policy to grant severance pay to employees who were involuntarily terminated from their employment with the company whether or not they suffered a subsequent period of unemployment. The policy was conditioned simply on the involuntary separation from Chemicals. The severance policy rewarded the employees' previous commitment to Chemicals and, at the same time, served to alleviate the pain of unemployment for some. When the plaintiffs were severed from Chemicals on March 15, 1983, a new condition was added to the policy: terminated employees subsequently employed by the company that purchased Chemicals' assets were not eligible for severance pay. Although plaintiffs were, indisputably, involuntarily terminated without cause from Chemicals, that condition was no longer sufficient. Contrary to Chemicals' assertions, the company did not distinguish between those employees who went to work for Steuber and those who did not, as much as it distinguished between those employees who were terminated on March 15, 1983 and those who were terminated prior to that date. Accordingly, we find that Chemicals' denial of severance benefits to plaintiffs was arbitrary and capricious.

### 4. Chemicals' Counterclaims

■ *First thru Fifth Counterclaims:* Chemical's first five counterclaims are asserted against Macdonald for the entire amount of its severance liability based on his failure to list the liability under section 14 of the March 1, 1983 sales agreement between Chemicals, Macdonald and Steuber. The first counterclaim is for breach of contract, the second and third for misrepresentation, and the fourth and fifth for fraud.

These counterclaims fail for several reasons. In the first place, the stated purpose of section 14 of the sales agreement, which required Macdonald to list all of Chemicals' creditors who were asserting any claims against the company, was to comply with the Bulk Transfers provision of the Uniform Commercial Code (U.C.C. §§ 6–101 *et seq.*). That statute was designed to protect a selling company's creditors, not the selling company itself. *See* Official Comment 3 to U.C.C. § 6–101 (1977) ("The contribution of the bulk sales laws ... is in the requirement that creditors receive advance notice of bulk sales."). That that was also the purpose of the provision in the sales agreement is made clear by section 14(f), which gave Steuber the right to terminate the deal in the event Chemicals did not comply with the Bulk Transfers statute. Because section 14 of the sales agreement was designed to protect Chemicals' creditors—such as the plaintiffs in this action—and not the company itself, Chemicals cannot claim to have been injured by Macdonald's omission.

Tant also claims that he would have changed the terms of Chemicals' asset sale if he had known about the severance claims. Tant Affidavit at ¶ 17. But this assertion conflicts with Tant's own admission that on or about March 1, 1983, Macdonald requested that plaintiffs receive severance. Tant Reply Affidavit at ¶ 18. Given the fact that Tant already knew about and rejected the severance claims, Chemicals cannot now assert that it detrimentally relied on Macdonald's failure to list those claims on March 4, 1983 and March 15, 1983. Furthermore, it is difficult to conceive how Chemicals was damaged by the omission. Chemicals has not offered any proof that the price it received for its separately enumerated and valued assets—including such items as cars, furniture and inventory—would have been affected by the unrelated severance claims against Chemicals.

Lastly, we address Chemicals' assertion that "if plaintiffs have a right to severance from Chemicals, it is due to Macdonald's failure to identify the claims in his sworn statement." Defendant's Trial Brief at 64. This claim incorrectly states the origin of Chemicals' severance pay obligation. Macdonald's failure to list the claims did not create any additional liability for Chemi-

cals. Chemicals' liability is solely the result of its own past practices relating to severance benefits.

*Sixth and Seventh Counterclaims:* Chemicals' sixth and seventh counterclaims were dismissed with prejudice on March 7, 1986.

 *Eighth Counterclaim:* Chemicals' eighth counterclaim is asserted against plaintiffs Macdonald, Brown and Ritorto (Chemicals' former president, vice president and office manager during the relevant time period) for the entire amount of its severance liability based on their having created and administered the severance plan without authority or authorization. Although plaintiffs admit that Chemicals' board of directors never formally approved a severance policy, they claim that certain directors and officers of Chemicals' parent company approved it. The best proof of this fact lies not in plaintiffs' contested assertions but in Tant's own testimony. Tant admitted that it was he who dictated the 1983 severance policy to Macdonald. *See* Tant Affidavit at ¶¶ 3, 7. As a result, it was Tant and not Macdonald, Brown or Ritorto who helped create the *de facto* severance policy that resulted in the liability at issue here.

*Ninth Counterclaim:* Chemicals' ninth counterclaim is asserted against plaintiffs Macdonald, Brown and Ritorto for the amount of tax payments that it has been unable to collect from fourteen former employees whose severance checks in 1983 mistakenly did not include tax withholding. Plaintiffs argue that they were instructed by the officers in charge of Chemicals' liquidation not to withhold taxes from the checks. Macdonald Affidavit at ¶ 52; Ritorto Affidavit at ¶¶ 7–10. They point to convincing evidence that Chemicals' new treasurer continued this practice when he signed a severance check in early March 1983. Ritorto Affidavit at ¶ 12. There is no evidence in the record that this mistake, if indeed plaintiffs were responsible for it, was the result of fraud or dishonesty. Chemicals' proper remedy, therefore, lies not in an action against its former corporate officers but against its

former employees who benefited from the mistake.

*Tenth Counterclaim:* Plaintiff Scott Brown concedes his liability to Chemicals for $4,764.10 plus interest.

## CONCLUSION

The Court thus finds that the plan administrator's decision to deny severance benefits was arbitrary and capricious. Chemicals is hereby ordered to pay severance benefits to plaintiffs in an amount equivalent to the established minimum level set out above, plus interest. The first, second, third, fourth, fifth, eighth and ninth counterclaims are dismissed. The amount of Chemicals' tenth counterclaim is to be deducted from the severance payment owed Brown.

SETTLE ORDER.