William R. FRANK

v.

COLT INDUSTRIES, INC., Colt Industries Operating Corporation formerly Crucible, Inc., Colt Industries Operating Corporation Severance Plan for Salaried Employees.

Paul K. SCHAKE, et al.,

v.

COLT INDUSTRIES OPERATING CORPORATION SEVERANCE PLAN FOR SALARIED EMPLOYEES.

Appeal of William R. FRANK, Paul K. Schake, Jerome P. Bressanelli, John R. Butchko, Thomas M. Costello, John E. Grimm, George W. Henglein, William J. Kofalt, Theodore R. Krupa, John R. Kundick, Theodore Lehmann, Albert N. Morrison, Carl J. Meyers, Robert Trbovich, Louis H. Young, Jr., Jesse Presutti, and Robert R. Vlah.

No. 89-3412.

United States Court of Appeals, Third Circuit.

Argued Dec. 15, 1989.

Decided Aug. 6, 1990.

Rehearing and Rehearing In Banc Denied Sept. 11, 1990.

James J. Ahearn (argued), Ligonier, Pa., for appellants.

William H. Powderly, III (argued), Jones, Day, Reavis & Pogue, Pittsburgh, Pa., for appellee.

Before STAPLETON, GREENBERG, and GARTH, Circuit Judges.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

In this case we are presented with a claim by former employees for severance pay pursuant to what they assert is an employee benefit plan covered by the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, codified as amended, 29 U.S.C. § 1001 *et seq.* We have found ourselves visiting this complex area with great frequency recently. *See, e.g., Hozier et al. v. Midwest Fasteners, Inc.,* 908 F.2d 1155 (3d Cir.1990); *Flick et al. v. Borg–Warner Corp.,* 892 F.2d 285 (3d Cir.1989); *Ulmer v. Harsco Corp.,* 884 F.2d 98 (3d Cir.1989). The case currently before us requires us to determine whether the employer's creation of a new benefit to be paid to certain employees upon termination supplants rights they possessed under a previously established severance plan. In the alternative, the employer asks us to find that it permissibly denied severance benefits pursuant to its reservation in the plan documents of complete discretion over the payment or withholding of severance pay. We find that the district court erred in concluding that the employer's institution of "Continuance Bonuses" supplanted the employees' previously established right to severance pay and in granting summary judgment in favor of the defendant on that basis. We also conclude that the defendant waived any argument predicated upon the discretion provision of the severance plan by its failure to raise this argument in prior proceedings, and therefore that the judgment of the district court may not be affirmed on this alternative ground. Finally, reviewing the district court's denial of plaintiffs' cross-motion for summary judgment, we conclude that all but three of the plaintiffs are entitled to severance pay as provided by the Plan.

## I. *Facts and Procedural History*

In 1982, Colt Industries Operating Corporation (CIOC), through its subsidiary Cruci-ble, Inc., decided to either sell or close operations at its plant in Midland, Pennsylvania.[1] This decision has led to an extraordinary amount of litigation, some of which has made its way to this Court. *See Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan,* 854 F.2d 1516 (3d Cir. 1988), *cert. denied* —— U.S. ——, 109 S.Ct. 3155, 104 L.Ed.2d 1019 (1989); *Anthuis v. Colt Industries Operating Committee,* 789 F.2d 207 (3d Cir.1986). Indeed, this is the second time the instant case has come before us. In 1987, this case was briefed and argued, but because the district court had applied an "abuse of discretion" standard in reviewing the plan administrator's decision to deny severance pay, and this court had recently announced that a plenary standard is called for, at least when an employer acts as plan administrator, *Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134 (3d Cir.1987), we held the case to await the result of Supreme Court review of that case. The Supreme Court affirmed *Bruch* with regard to standard of review, holding that "for purposes of actions under [29 U.S.C.] § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). We thereafter vacated the order of the district court and remanded the matter for further consideration. In a one paragraph memorandum order, the district court held that "[a]fter further review, we find that we reached the correct result under the standard established in *Bruch.*"

Plaintiffs in the instant case once again appeal the district court's summary judgment in favor of the defendant, as well as the denial of summary judgment in their own favor.

---

**1.** Crucible, Inc., has since been dissolved and Colt Industries Operating Corporation Severance Plan for Salaried, Nonunion Employers, as its successor-in-interest, is the defendant in this action. For convenience' sake we shall herein frequently refer to the defendant as "Colt," even when referring to actions taken by its predecessor-in-interest.

## The Severance Plans

It is undisputed that prior to the decision to close or sell Midland, Crucible maintained a defined severance policy, consisting of a "Basic Severance Plan" and a "Key Executive Severance Plan." Generally, the basic plan provided for severance pay of between one-half and four months' salary, and the key executives' plan provided for between two and six months' salary, with the precise amount depending upon the employee's years of service at Crucible. Most of the plaintiffs in this case were classified as "key executives." While Colt acknowledges that these policies are employee benefit plans governed by ERISA, it did not realize this was the case at the time the policies were promulgated, and did not comply with the reporting, disclosure, and other requirements imposed by the Act. 29 U.S.C. § 1021 *et seq.* As a result, it is impossible to identify a single document as "the Plan"; instead, the plan terms are described in a series of documents. The record does not disclose which, if any, of these documents were distributed to the participants. However, the plaintiffs alleged in their complaint that "[t]he provisions of the defendant Plan were published and made known to the plaintiffs," Amended Complaint ¶ 6, and the defendant in its answer admitted this allegation. Answer to Amended Complaint ¶ 6.

The most complete plan description is found in a five-page memorandum dated April 29, 1981, titled "Severance and Termination Allowance for Non–Union, Salaried Employees." App. at 164–68. This memo, from E.A. March, Group Vice–President, begins by stating that "[t]his memorandum rescinds my [earlier memo] on this subject." App. at 164. Accordingly, we conclude that the contents of any earlier documents are not relevant in determining the terms of the Plan. The distribution list at the end of the memo indicates that none of the plaintiffs were provided with a copy; indeed, only two people at Midland, Division President Vensel and Division Vice President in Charge of Personnel Roy Barr, received a copy.

The Plan is also described, with slight but significant differences, in a document dated April 20, 1982, titled "Salaried Exempt and Excluded Employees." App. at 170–72. While there is no direct evidence that this document was distributed to employees, the language contained therein strongly suggests that this was the case. In particular, the last paragraph reads: "This information will enable you to start thinking about your various options when your services are terminated. You will, however, have an opportunity to discuss these options in more detail with a personnel representative when the time arrives." App. at 172.

Finally, the record contains an undated memorandum entitled "Summary—Special Midland Salary Non–Union Shutdown Program." App. at 173–176. This document, which does not appear to have been distributed to employees, contains the only description of the distinct—and more lucrative—benefits for "key executives."

The parties agree as to the amounts provided by the "Basic Severance Benefit" and the "Key Executive Benefit," as well as which plaintiffs were classified as key executives and which were not.

## The Continuance Agreements

When Crucible decided to terminate its Midland operations, it did not abandon the hope that the Midland plant could be sold as an ongoing entity. The attraction of the business naturally would be increased if Crucible could deliver with the physical plant a number of experienced employees; additionally, retention of such employees was necessary to ensure an orderly "winding down" process. Of course, after the closing announcement these employees would be likely to immediately seek new jobs and would resign the moment they found them. Recognizing this, Crucible created an incentive for selected employees to remain for fixed periods of time, by presenting them with documents entitled "Continuance Agreements." While the specific wording of these agreements varied, the following is a representative example:

A Continuance Agreement

Between [name of the employee] and Crucible Stainless and Alloy Division, Crucible, Inc., for the period March 1, 1982 until September 30, 1982 (the "Agreement Period").

It is agreed that should you voluntarily continue full employment at Crucible Stainless and Alloy Division for the Agreement Period, you shall receive your current compensation and benefits and upon September 30, 1982 should separation be necessary, you shall receive an accrued continuance bonus equal to a month's salary for each month of continued employment up to September 30, 1982 (seven (7) months' accrued).

Should a purchaser of Crucible Stainless and Alloy Division continue your employment at any time during this Agreement Period, making separation unnecessary, no accrued continuance bonus shall be provided ...

Should you be provided a comparable position of employment within another Colt division, wherein no separation is necessary, the continuance bonus will not be provided.

Voluntary resignation or termination for cause during the Agreement Period makes this agreement null and void.

The chief variation among these agreements was in the length of the agreement period offered: generally, employees were offered periods of either five, seven, or ten months, although some agreements were extended for indefinite periods. The agreements were signed by the employee and usually by Vensel.

The crux of the dispute currently before us is whether the Continuance Agreements altered the severance plan rights of the employees who signed them. The record presents conflicting evidence as to what the employees were told about this at the time they were presented with the agreements. At least three separate meetings were held in Vensel's office, with employees grouped by the length of the agreement period they were offered; Crucible seems to have been attempting to avoid jealousy among employees who were not offered agreements, or were offered agreements for shorter periods. According to Vensel, "at initial meetings with participants who eventually signed the Continuance Agreements, I specifically stated that the Continuance Bonus Benefit was in lieu of any other severance benefit to which they were entitled." Vensel Affidavit ¶ 11.

The plaintiffs' version is somewhat different. While nobody claims that Vensel specifically stated *in haec verba* that they would receive *both* the Continuance Bonus and their regular severance pay, a number of plaintiffs have testified that this was their understanding. They attribute this understanding to two different sources. First and foremost was the wording of the Agreement itself. For example, plaintiff Bressanelli testified:

In reading the agreement, nowhere did it say it was going to supplement [sic; supplant?] our severance pay and the statement in the agreement that we would receive our normal company compensation and benefits—our current compensation and benefits and then upon separation, I would receive an accrued continuance bonus equaled to my month's pay. Just by that statement, I assumed that I was going to get my three months plus the six months and I was elated over that possibility.

. . . . .

Everyone sort of read the contract the same way. Nowhere here does it say that we would not receive our severance pay.

App. at 260. Second, the plaintiffs deny that Vensel made any statement about the Continuance Bonus supplanting severance pay, and offer testimony that Vensel assured them that they would "lose nothing" by signing the agreements:

The only comment I made was, "Do we have to sign it now," and he said, "Why wouldn't you want to," and I said, "I'd like to take it home and take a look at it," and he said, "Why would you like to do something like that? It's such a good thing." He said, "If you want out, you can get out.

It's only binding on one side, and that's Colt's," so I signed it.

App. at 243 (Bressanelli Deposition).

> [Vensel] pointed out it was a no-lose proposition for us. We have everything to gain and nothing to lose by executing this agreement.

App. at 292 (Grimm Deposition).

Crucible's attempts to sell the Midland operations proved fruitless, and the shutdown proceeded to completion. Whatever impression the employees had that Crucible planned to give them both severance pay and a Continuance Bonus was disabused sometime after July, 1982, when the first participants finished their agreement period and learned that they would not be receiving all of the benefits they had expected. Nonetheless, all but three of the plaintiffs completed their agreement periods and collected their bonuses, while continuing to maintain they were entitled to severance pay as well.[2]

Three of the plaintiffs, Paul Schake, William Frank, and George Henglein, did not complete their agreement periods, but instead voluntarily left Crucible to accept employment elsewhere. These three did not receive Continuance Bonuses and do not claim they are entitled to them. They argue that they are nonetheless entitled to severance pay under the Plan, and that Crucible relied upon an illegitimate breach of contract theory to deny them this benefit. We shall address the claim of these three plaintiffs separately.

## II.

 From the outset of this dispute, Colt has consistently maintained that the plaintiffs were denied regular or key executive severance benefits *because* they had signed the Continuance Agreements and received Continuance Bonuses pursuant to these agreements. Forms filled out by a Colt personnel representative during each employee's exit interview indicated that plaintiffs (with the exception of Schake, Frank, and Henglein) were to receive "severance pay" as provided in their Continuance Agreements. E.g., App. at 128, 134, 138, 140. Responding to a demand letter from plaintiff's counsel, the present Plan Administrator, Frank Hunter, explained:

> The Severance Program permits the creation of termination and severance allowances other than those explicitly set out in the Severance program under special circumstances and with prior approval of Company officials. The predecessor Plan Administrator alludes to such alternative benefits available under the Severance Program: The Basic Severance Benefit, the Key Executive Severance Benefit, and the Continuance Bonus Benefit. It was the predecessor Plan Administrator's opinion, and one in which I concur, that the Continuance Bonus Benefit was established as a special severance pay or termination allowance under the Severance Program.

App. at 215 (citations omitted). Similarly, Vensel's affidavit states that "[t]he Continuance Bonus Benefit was one of the optional severance benefits available under the Severance Plan." Vensel Affidavit ¶ 11.

Thus, Colt's argument has been that approval of regular or key executive severance benefits was properly withheld because the Plan called for payment of severance pay or a Continuance Bonus but not both. This theory is based on the following "other benefit" provision of the April, 1981, memorandum:

> III. Termination allowances or severance allowances, other than those permitted by this policy, will be possible under *very* special circumstances, but will require the prior approval of the Division President, the Group Vice President and the corporate Vice President of Personnel.

App. at 167–68.

The district court accepted Colt's contention that "the Continuance Bonus agree-

---

**2.** One plaintiff, Theodore Krupa, signed his Continuance Agreement on September 15, 1982, at least one month after the Company's position had been put into practice. It is therefore arguable that Krupa could not have believed he would receive both benefits. For reasons we shall discuss below, *see infra* nn. 3 & 6, we do not find that Krupa's position is materially different from the rest of the plaintiffs.

ments were created pursuant to [the other benefit provision]," holding that "the administrator's interpretation of the plan was reasonable and is almost certainly the meaning intended by [Colt] when it authorized the Continuance Bonuses." Opinion at 6. In reaffirming this conclusion after we had remanded for reconsideration in light of *Firestone v. Bruch,* the district court necessarily held that the administrator's interpretation is not only reasonable, but is also the district court's own plenary interpretation of the plan.

In reviewing a grant of summary judgment, we apply the same test the district court should have utilized. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Applying this standard, we disagree with the district court's interpretation of the Plan, and conclude that the Continuance Bonuses were *not* alternative benefits, but rather were distinct agreements that had no effect on the plaintiffs' rights to severance pay under the Plan.

Language found in every Continuance Agreement promises the employee that "you shall receive your current compensation and benefits." A number of plaintiffs testified that they interpreted these words to mean that their previously established severance benefits—the terms of which Colt acknowledges the employees were aware—would be unaffected by their decision to sign the Agreement. This interpretation was entirely reasonable and, in our

estimation, the only rational meaning to be taken from the quoted words. Colt attempts to escape the force of these words by arguing that since severance pay is not awarded until some date in the future it is not a *"current* benefit." We are unpersuaded. A severance benefit, like maternity leave or pension benefits, is a current benefit because it is conferred by a currently existing benefit program. Giving words their ordinary meaning, any reasonable employee would construe "current benefits" to include benefits under an established severance plan.[3]

Colt's position is therefore untenable unless something in the Severance Plan at the time the Continuance Agreements were signed gave fair notice that severance benefits would not be payable under circumstances like those in which these plaintiffs found themselves. What the "current benefits" consisted of was defined by the Severance Plan as it then existed. For example, the Plan provides that severance pay will only be awarded to employees who "remain[ ] at work to a date established *by the Company."* App. at 165 (emphasis in original). Thus, as we shall discuss in more detail below, an employee who voluntarily resigned would not be eligible for severance pay even if he had signed a Continuance Agreement with its attendant promise that "current benefits" will be undisturbed. The language of the Continuance Agreements cannot be interpreted as a promise to give the employee severance

---

**3.** As we have previously noted, *see supra* n. 2, at the time plaintiff Krupa signed his Agreement Colt had already put its view of the mutual exclusivity of Continuance Bonuses and severance pay into practice. While the record does not contain evidence that Krupa was aware that Colt had denied severance pay to employees who had signed Continuance Agreements when he signed his Agreement, there is testimony by other plaintiffs that they had quickly learned of Colt's actions in this regard.

Nonetheless, we conclude that the timing of Krupa's Agreement is irrelevant in this case. Since the language of the Continuance Agreements is unambiguous, extrinsic evidence of Colt's intent is inadmissible to demonstrate that the term "current benefits" excluded the severance benefits. *See In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47, 55 (1987); *Northbrook Insur-*

*ance Co. v. Kuljian Corp.,* 690 F.2d 368, 372 (3d Cir.1982) (applying Pennsylvania law). While we cite Pennsylvania law for this proposition under the assumption that the Continuance Agreements are contracts governed by state law, we would reach the same result if the Agreements are employee benefit plans within the meaning of ERISA, as discussed in more detail in Section III, *infra,* and therefore we need not answer the question of how to properly characterize these Agreements, which we previously raised in *Anthuis v. Colt Industries Operating Corp.,* 789 F.2d at 212–13 n. 5. In sum, the fact that Krupa may have had reason to believe that Colt considered the Continuance Agreement to supplant existing severance benefits does not alter the fact that the plain language of the Agreements contains a promise that they would not have this effect.

pay under circumstances exempted by the existing Plan itself.

Accordingly, if the terms of the Severance Plan precluded payment of *both* a Continuance Bonus and severance pay, then we would have to sustain Colt's position. But there was no such provision in the Severance Plan when the Continuance Agreements were signed. While the other benefits provision permits the creation of different benefits, it does not by its terms prohibit the creation of a benefit to be paid upon termination *in addition to* severance pay. Thus, it was entirely consistent with the Severance Plan for Colt to create a new benefit that would not supplant the existing severance pay.

## III.

■ Colt and the district court have fashioned a route around the clear and unambiguous wording of the Severance Plan and Continuation Agreements by looking to two internal memoranda setting forth minutes of a meeting of Colt officers at the Midland plant on March 18, 1982. Colt cites these memos, which purportedly summarize the benefits that will be paid to laid-off workers and state that workers receiving Continuation Bonuses will not be eligible for severance pay, as evidence of its intent when entering the Continuation Agreements. According to Colt, the intent evidenced by the memos is of crucial importance for two reasons: (1) the fact that Colt intended to make the benefits mutually exclusive rendered mutual exclusivity a term of the Plan—i.e., the meeting minutes constitute Plan amendments;[4] (2) alternatively, even if the minutes do not constitute Plan amendments, they evidence the settlor's intent, which under the governing principles of trust law is controlling.[5] In

short, Colt urges that the meeting minutes are either amendments to or conclusive interpretations of the Plan. We find that both of these theories are premised on misconceptions of trust law, particularly as it relates to ERISA.

Title I part 1 of ERISA sets forth a number of "reporting and disclosure" requirements for all employee benefit plans. For our purposes, three of these requirements are particularly important. First, "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). Second, every plan shall "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). Finally, "The [plan] administrator shall make copies of the plan description ... or other instruments under which the plan was established or is operated available for examination by any plan participant or beneficiary...." 29 U.S.C. § 1024(b)(2). Collectively, these provisions operate to ensure "that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." H.R.Rep. No. 1280, 93d Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5038, 5077–78.

While these provisions and others require the employer who establishes an employee benefit plan to do so in a relatively formal fashion, in order not to frustrate the legitimate expectation of employees courts have upheld plans that do not meet the reporting, disclosure, and other formality requirements of ERISA. *E.g., Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1502–04 (9th Cir.1985); *Bennett v. Gill & Duffus Chemicals, Inc.,* 699 F.Supp. 454 (S.D.N.Y. 1988); *see generally Donovan v. Dilling-*

---

4. In addition to the reason discussed below, this first theory must fail for a large number of plaintiffs for the simple reason that most of the Continuance Agreements were signed before the minutes were prepared. Since the phrase "current benefits" refers to benefits in effect at the time the Agreement was signed, any subsequent amendments to the Severance Plan could have no effect.

5. Colt points to *Bruch* as authority for the proposition that trust law governs ERISA matters, 109 S.Ct. at 954 ("ERISA abounds with the language and terminology of trust law.... [W]e are guided by principles of trust law."); *see also Payonk v. HMW Industries, Inc.,* 883 F.2d 221, 231 (3d Cir.1989) (Stapleton, J., concurring), and to trust law as authority for the proposition that the settlor's intent governs the extent of the benefit conferred.

*ham,* 688 F.2d 1367, 1373 (11th Cir.1982) (an ERISA plan exists if "from the surrounding circumstances, a reasonable person can ascertain the intended benefits, a class of beneficiaries, the course of financing, and procedures for receiving benefits."). But this does not mean that when an employer maintains an informal plan in violation of the statute, the policies underlying the statute become inoperative. For example, in light of ERISA's requirement that a plan be maintained in a written document, a written plan, no matter how informal, can never be modified orally. *See Hozier et al. v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1163–64 (3d Cir.1990); *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290 (5th Cir.1989); *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir.1986).

Nor is the only relevant distinction that between oral and written modifications. Where an employer has created an integrated document setting forth the terms of a benefit plan, as has happened in the present case, not every internal document containing a reference to management's interpretation of the plan should be regarded as a part of the plan itself. Where a plan has complied with ERISA by setting forth a method for accomplishing amendment, of course each putative amendment will be evaluated by reference to that method. Here, the Severance Plan violated ERISA by failing to set forth an amendment procedure. Arguably, the benefit provisions of such a plan cannot be amended unless and until an amendment procedure is added to the plan and complied with. *See Hozier, supra,* 908 F.2d at 1163 n. 9. We need not reach that issue, however, because we conclude that the meeting minutes in question do not meet the minimal standards necessary for a successful amendment of an ERISA plan.

■ We are guided in part by precisely the principle of trust law Colt has misconstrued in advancing its defense. The Restatement (Second) of Trusts teaches that "[t]he phrase 'terms of the trust' means the manifestation of intention of the settlor with respect to the trust expressed in a manner which admits of its proof in judicial proceedings." *Id.* at § 4. Further, "[a] trust is created only if the settlor properly manifests an intention *to create a trust." Id.* at § 23 (emphasis added). "The intention of the settlor which determines the terms of the trust is his intention at the time of the creation of the trust and not his subsequent intention." *Id.* at § 4 comment a. Two points are thus clear: First, in order for a manifestation of intention to *constitute part of the trust,* there must be an intention to *create* a trust or an amendment thereto. There is a fundamental difference between actions that are intended to create or amend a trust and actions that are merely intended to construe an existing trust; only the former are "terms of the trust." Second, this relevant intent is the settlor's intent at the time of the creation or the amendment. When a settlor states "I intended to do Y" *after* the trust has been created, that statement does not alter the terms of the trust, although it may be relevant in construing the terms of the trust if they are ambiguous. In sum, while the intent of the settlor is a touchstone for construing a trust, only a specific type of manifestation of intent can constitute a term of the trust.

The meeting minutes Colt relies on do not manifest this type of intent. They were not contemporaneous with the creation of the Severance Plan, and therefore are not manifestations of Colt's intent at the time of the Plan's creation. Nor were they considered by Colt to be amendments to the Severance Plan, thus constituting part of the Plan in the same manner as the March 1981, March 1982, and April 20, 1982, memoranda did. Most revealing in this regard was counsel for Colt's candid acknowledgement at oral argument that if an employee, exercising his rights under ERISA, had requested to see the currently operative plan documents, he would have been supplied with the March 1981 document, the March 1982 document, and the April 20, 1982, document, but would not have been supplied with meeting minutes. Similarly, while Colt admitted in its answer that the employees were told of the terms of the Plan, it does not contend that the two meeting minutes were circulated. The

fact that Colt itself drew such a distinction between the minutes and the other memoranda demonstrates that Colt recognized that the minutes were not amendments to the Plan. Finally, the minutes do not indicate that Colt intended to at any subsequent date incorporate the interpretations set forth therein into the type of document that would represent an effective Plan amendment; therefore, the minutes are not manifestations of Colt's intention to amend the Plan. In such circumstances, we believe ERISA requires us to regard the minutes as not a part of the Plan.[6]

Colt's contention that the meeting minutes are nonetheless conclusive because they are evidence of the settlor's interpretation of the Plan also fails. It is true that trust law looks to the settlor's intent, but only the settlor's intent *as manifested in the trust instrument* is relevant, unless there is an ambiguity in the instrument. *See* Restatement (Second) of Trusts § 4 comment c; *id.* at § 38 comment a. Uncommunicated intent not reflected in the trust instrument is irrelevant. *Id.* at § 4 comment a. As we have already noted, the Severance Plan as described in the three memos contains no ambiguity concerning whether the Continuance Bonuses supplant severance pay. Accordingly, the meeting minutes cannot be used to deprive those employees who signed Continuance Agreements of their severance rights under the Plan.

## IV.

■ In the current appeal, Colt has articulated a new theory to justify its decision not to award the plaintiffs severance pay. Shifting from its previous reliance on Section III of the Plan and its authorization for creating additional benefits, the defendant now argues that plaintiffs were properly denied severance pay as an act of discretion pursuant to two paragraphs found at the conclusion of the April 1981 memo. They provide, in essence, that severance pay will only be granted when the company wishes to do so:

> The procedures and allowances contained herein are *not* to be automatically applied to any employment termination, and the application of these procedures and allowances to an incident of employment termination shall not serve as a precedent for any subsequent employment termination.

> Each incidence of employment termination will be evaluated as an isolated occurrence and the Company shall determine in each instance the applicability of these allowances.

App. at 168. Relying on this language, the defendant now argues that "Crucible clearly intended, and the terms of the Severance Plan clearly directed, that [the Division President, Group Vice President, and Corporate Vice President of Personnel] were to consider the unique circumstances of each employment termination, and to determine whether Severance Pay was appropriate in each instance." Defendant's Brief at 21.

Thus, Colt now takes the position that it was free to refuse an employee severance pay for any reason whatsoever, including, significantly, its own self-interest. In support of this position, Colt cites a number of cases from this Circuit holding that an ERISA plan may reserve discretionary authority to management with regard to certain decisions. *E.g., Pane v. RCA,* 868 F.2d 631, 638 (3d Cir.1989) (terms of severance plan gave Board of Directors discretion to choose participants); *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 280–81 & n. 2 (3d Cir.1988) (early retirement benefits conditioned on employer's determination that early retirement is in employer's interest). This new argument would raise important issues of first impression concerning the ability of an employer to reserve *complete* discretion over employee eligibility for benefits under an ERISA plan, as well as difficult questions of fact as to whether Colt had actually exercised its discretion in favor of awarding sever-

---

**6.** Since the terms of the Severance Plan had not been successfully amended by the time Krupa signed his Agreement, once again Krupa does not stand in a materially different posture from the remainder of the plaintiffs.

ance to all employees terminated as a result of the plant shutdown.[7]

We hold that the defendant has waived this argument by its failure to present it in the proceedings prior to this appeal. "We generally refuse to consider issues that are raised for the first time on appeal." *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir.1976). We have examined the voluminous record of proceedings before the district court; while the memoranda of law submitted in support of and opposition to the motions for summary judgment were not made a part of that record, we have also obtained those memoranda. At no point in any of these documents do we find an exposition of the theory currently being advanced. Moreover, Colt did not present this argument when the case was before us on the previous appeal. *See Wisniewski v. Johns–Mansville Corp.*, 812 F.2d 81, 88 (3d Cir. 1987) ("Appellants' alternative theory of recovery was not before this court in the earlier appeal; *a fortiori*, it could not be remanded to the district court. Consequently, we cannot consider it here."); *cf. Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798, 804 (3d Cir.1987) (after remand, a litigant may not pursue "a new theory fundamentally at odds with her prior position" in the absence of newly discovered evidence or other change in circumstances).

What we do find, in the memoranda submitted to the district court as well as Colt's brief in the prior appeal, is a fleeting discussion of the "prior approval" requirement set forth in the April 1981 memorandum. The discussion in Colt's brief from the 1988 appeal is representative:

[T]he employees had to have prior approval by "the Division President, Group Vice President and the corporate Vice President of Personnel." ...

At no time have any of the Employees ever asserted or furnished proof that they have individually or collectively received necessary approvals. To the contrary, Mr. Callahan, the Division Vice President, Mr. Vensel, [then] the Group Vice President, and Mr. Barr, Vice President of Personnel, never gave all of the necessary approvals to any Employee and it has been affirmatively stated that the Employees are not entitled to more benefits.

Defendant's 1988 Brief at 24. The brief then explains the various reasons why the three officers referred to concluded that plaintiffs were not entitled to benefits; of the reasons advanced in that brief, only the argument based on Section III is still being advanced. *See also* Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment at 10, 26; Defendant's Reply Brief [re: same] at 16–17, 19–20. We cannot interpret these sentences to refer to the much broader argument currently being advanced based upon a completely different provision of the Plan. While it could conceivably be argued that the defendant's previous reliance on absence of prior approvals logically incorporates every reason why such approval might properly be withheld, including an unlimited grant of discretion, it does so only in the manner that the statement "defendant properly rejected plaintiff's demand for payment" logically incorporates every valid defense.[8] Particularly where important and complex issues of law are presented, a far more detailed exposition of argument is required to preserve an issue. *See* Fed.R.App. Pro. 28(a)(4) & 28(b) (appellee's brief must con-

---

**7.** With regard to this question there is evidence from which a finder of fact could draw either conclusion. The April 1982 memorandum states that "Salaried employees whose services are no longer required due to present economic conditions *will be* offered a choice of the following options," one of which is severance pay in accordance with the previously established Plan. App. at 170 (emphasis added). However, the meeting minutes indicate that a decision had been made *not* to grant severance pay to recipients of Continuance Bonuses.

**8.** In fact, Colt made a very similar assertion in its answer to plaintiffs' amended complaint: "[P]laintiffs fail[ed] to meet conditions precedent to entitlement to the alleged employee benefits." Clearly, such a broad assertion does not relieve Colt from the responsibility of identifying the specific conditions precedent it contends are lacking.

tain "the contentions of the [appellee] with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on"); *Hershinow v. Bonamarte,* 735 F.2d 264, 266 (7th Cir.1984); *Carducci v. Regan,* 714 F.2d 171, 175–77 (D.C.Cir.1983).

## V.

 Three plaintiffs in this case stand in a materially different posture from the remainder. Plaintiffs Schake, Frank, and Henglein did not work through the period provided in their Continuation Agreements, but instead resigned to accept other employment. Recognizing that they failed to fulfill the conditions of the Agreements, they do not seek Continuation Bonuses. However, they do seek severance pay as provided by the Plan, arguing that because they left the company as the "direct result" of the shutdown of the Midland plant they were "effectively terminated" even though Colt still desired their services. We agree with the district court that there is no merit to this argument. The Plan clearly states that "[s]everance allowance will be paid only if the employee remains at work to a date established *by the Company.*" App. at 165 (emphasis in original). Common sense teaches that as long as an employer offers to pay you tomorrow, you cannot get severance pay for quitting today.

Plaintiffs Schake, Frank, and Henglein have offered several arguments in an attempt to avoid both the language of the Plan and the common sense just alluded to. First, they contend that there was no further need for their services since the plant had been effectively shut down. In essence, there was nothing for them to do, save playing golf in the afternoons. App. at 445–449 (Henglein and Schake Depositions). As best we can determine, plaintiffs' theory is that since this lack of work was "the proximate result of the shutdown of the Midland plant," Plaintiffs' Brief at 39, they were constructively discharged. In this context, we do not believe that being paid to do nothing is a working condition so intolerable as to constitute constructive discharge.

Next, plaintiffs propose that "[t]he refusal of the Plan and the employer to ... establish termination dates which reflected the employer's actual needs and respected the needs of the Employees as well" was a violation of Colt's duty to administer the Plan in good faith. Plaintiffs' Brief at 39–40. In other words, Colt had a fiduciary duty to fire the plaintiffs, which it violated. We are not persuaded.

Finally, Schake, Frank, and Henglein make the related argument that the defendant administered the Plan in a discriminatory fashion by granting severance pay to others similarly situated. Plaintiffs have not produced competent evidence of this allegation sufficient to withstand summary judgment. While Schake did testify that he knew of other employees who left voluntarily and received severance pay, he acknowledged that "technically they did terminate them, but the policy was to find people who were willing to be terminated ... because we were trying to reduce forces." App. at 437. Thus, there is no evidence to support the contention that Colt granted severance to employees who left voluntarily at a date *not* set by the company. Therefore, this argument merges into the previous argument, with plaintiffs urging the court to scrutinize the employer's decisions as to whether to terminate employees. We reject this invitation because it is clear to us that such a decision falls within the core of responsibilities fulfilled by an employer wearing its "employer hat," and therefore ERISA's fiduciary duties do not attach. *Payonk v. HMW Industries, Inc.,* 883 F.2d 221, 225 (3d Cir. 1989). If plaintiffs' argument is instead that Colt *as* employer engaged in illegal discrimination, they have failed to allege that the difference in treatment was motivated by impermissible considerations.

## VI.

Because Schake, Frank, and Henglein voluntarily resigned at a date not set by the employer, we conclude they are not entitled to severance pay. With regard to the other plaintiffs, we find that the district court erred in holding that the Contin-

uance Agreements supplanted the previously established severance benefits. Since Colt has waived its right to invoke the complete discretion provision in defending against plaintiffs' claims for severance pay pursuant to the Plan, we will vacate the district court's grant of summary judgment in favor of the defendant. Moreover, since there are no remaining disputes as to the terms of the Plan, and since Colt was under an obligation to present all possible arguments in opposition to plaintiffs' motion for summary judgment, *Newark Morning Ledger*, 539 F.2d at 932, we conclude the remaining plaintiffs are entitled to the severance pay provided under the Plan. Accordingly, we will remand to the district court with instructions to enter summary judgment in favor of these plaintiffs.