James **BELLINO**, et al., Plaintiffs, Appellees,

v.

**SCHLUMBERGER TECHNOLOGIES, INC.**, Defendant, Appellant.

No. 91–1144.

United States Court of Appeals, First Circuit.

Heard June 4, 1991.

Decided Sept. 11, 1991.

Rehearing and Rehearing En Banc Denied Nov. 20, 1991.

W. Irl Reasoner with whom Jean M. Frazier, Baker & Hostetler, Columbus, Ohio, Joseph J. Hahn, and Bernstein, Shur, Sawyer & Nelson, Portland, Me., were on brief for defendant, appellant.

Francis M. Jackson Portland, Me., for plaintiffs, appellees.

Before BOWNES, Senior Circuit Judge, and SKINNER,* and STAHL,** District Judges.

STAHL, District Judge.

Plaintiffs-appellees, former employees of defendant-appellant Schlumberger Technologies, Inc. ("Schlumberger"), sued to recover severance benefits from Schlumberger pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

* Of the District of Massachusetts, sitting by designation.

** Of the District of New Hampshire, sitting by designation.

U.S.C. § 1001, *et seq.* Schlumberger appeals from an order of the district court granting appellees' motion for summary judgment on their ERISA claim and denying Schlumberger's motion for summary judgment on the same claim. 753 F.Supp. 394.

### 1. Facts

The undisputed facts are as follows. In 1989, appellees were employed by defendant Schlumberger as maintenance workers at a National Semiconductor Corporation ("NSC") facility in South Portland, Maine. At that time, NSC was purchasing maintenance services and maintenance related equipment from Schlumberger pursuant to a series of contracts and purchase orders.[1]

Early in 1989, NSC decided that it would be economically advantageous to employ its own maintenance staff to perform the work being done by Schlumberger and notified Schlumberger in writing on June 5, 1989, that it was canceling the maintenance contract. Unable to persuade NSC to change its position on cancellation, Schlumberger subsequently entered into negotiations with NSC. The negotiations culminated in an agreement, under the terms of which Schlumberger was to "transition" to NSC much of the maintenance work it had handled under the earlier contract. Additionally, appellees were to be "transferred" from Schlumberger to NSC; Schlumberger agreed to aid NSC in hiring appellees and was to receive in return $5,000 for each appellee who accepted an offer from and commenced employment with NSC. The contract contemplated that nine of the appellees would end their employment with Schlumberger on September 4, 1989, and begin employment with NSC on September

5, 1989. The other two appellees were to end their employment with Schlumberger on December 31, 1989, and to commence employment with NSC on January 1, 1990.

On July 31, 1989, Schlumberger's personnel manager, Gerard Yanoshak, met with appellees and informed them of the new contract with NSC. He further informed appellees that they would receive offers from NSC to perform substantially the same job that they had performed for Schlumberger. Appellees also were told that if they chose to reject NSC's offer, they would be treated as having resigned from Schlumberger. Finally, Yanoshak informed appellees that, whether or not they accepted NSC's job offers, they would not be eligible to receive severance benefits from Schlumberger. Yanoshak explained to appellees that Schlumberger's policy was to deny severance benefits to departing employees who are offered comparable jobs at comparable pay. That policy, however, did not appear explicitly in Schlumberger's written ERISA plan.

On August 18, 1989, appellees accepted the employment offers extended by NSC. Nine appellees commenced employment with NSC on September 5, 1989. The other two commenced employment in January 1990. Appellees performed the same jobs for NSC that they had performed for Schlumberger at the same facility, received a higher wage from NSC, and did not miss a day's work as a result of their "transfer."[2]

Appellees initiated the instant action in the United States District Court for the District of Maine seeking severance pay from Schlumberger pursuant to Schlumberger's ERISA plan ("the Plan"). Applying a *de novo* standard of review, the district court determined that Schlumberger's un-

---

1. Previously, the South Portland facility had been owned by Fairchild Camera, a subsidiary of Schlumberger. In 1987, Schlumberger sold Fairchild to NSC, and NSC became the owner of the South Portland facility. Subsequent to the sale, Schlumberger continued to maintain its workforce, inventory, and equipment on the NSC premises in order to perform its contract work for NSC.

2. Appellees contend, however, that they are not as well off at NSC as they were at Schlumberger. They allege (1) that NSC did not credit their time spent at Schlumberger for the purpose of granting them certain NSC employee benefits, and (2) that their employment at NSC has been at risk due to their lack of seniority and NSC's allegedly fragile financial condition. Appellees further allege that one of the transferred, former Schlumberger employees already has lost his NSC job.

written policy of denying severance to departing employees who receive offers for comparable jobs was contrary to the plain language of the Plan. The court also determined that Schlumberger's oral representation to appellees of its unwritten policy was not a valid amendment to the Plan. The court concluded that Schlumberger terminated appellees because of "lack of work," and thus was required to grant them severance benefits pursuant to the terms of the Plan. Consequently, the court granted appellees partial summary judgment (on liability) with respect to their ERISA claim and denied Schlumberger's motion for summary judgment on the same claim. We affirm the decision of the district court.

## 2. Discussion

As Schlumberger appeals from an order on summary judgment, our review is circumscribed by Fed.R.Civ.P. 56.

> [W]e must, after perusing the record and all reasonable inference extractable therefrom in the aspect most generous to appellant, be 'fully satisfied that there is no genuine dispute as to any relevant fact issue and that the appellee is, as a matter of law, due the relief which the district court awarded.'

*Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 488 (1st Cir.1989).

■ Before discussing the merits of Schlumberger's appeal, we first determine the appropriate standard of review. Federal courts review ERISA claims *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Schlumberger argues that the arbitrary and capricious standard of review, rather than the *de novo* standard, is appropriate in this action, but points to no language in the Plan giving it the "discretion-

ary authority" required for that standard. Therefore, we review *de novo* Schlumberger's decision to deny appellees severance benefits.

■ We begin our discussion with an overview of the Plan. It is not disputed that the Plan is an "employee welfare benefit plan" under § 1002(1) of ERISA. *See Massachusetts v. Morash*, 490 U.S. 107, 116, 109 S.Ct. 1668, 1673–74, 104 L.Ed.2d 98 (1989). As such, it is exempted from the stringent vesting, participation, and funding requirements of ERISA "pension" benefit plans. *See, e.g., Reichelt v. Emhart Corp.*, 921 F.2d 425, 429 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); *Sejman v. Warner–Lambert Co., Inc.*, 889 F.2d 1346, 1348 (4th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990). However, ERISA does subject welfare benefit plans to certain disclosure and fiduciary requirements. *See Reichelt, supra.* For example, such plans must be "maintained pursuant to a written instrument" that provides "for one or more named fiduciaries" who have "authority to control and manage the operation and administration of the plan." [3] 29 U.S.C. § 1102(a)(1). In exercising that authority, the fiduciary must act "in accordance with the documents and instruments governing the plan." [4] 29 U.S.C. 1104(a)(1)(D).

■ The benefit provisions of an ERISA–regulated plan are interpreted under principles of federal substantive law. *See Bruch, supra,* 489 U.S. at 110, 109 S.Ct. at 953; *Burnham, supra* at 489 ("benefit provisions of an ERISA–regulated group life insurance policy must be interpreted under principles of federal substantive law"). "[T]he 'federal common law of rights and obligations,' while still in formation, must embody common-sense canons of contract interpretation." *Burnham, supra.* Accordingly, we confine our construction of the Plan terms to the intent

---

**3.** In the instant action, the Plan does not designate an administrator or fiduciary. Therefore, that role is assigned by operation of law to Schlumberger, the Plan's sponsor. 29 U.S.C. §§ 1002(16)(A)(ii) and 1002(21)(A).

**4.** This last requirement is subject to certain exceptions not pertinent to this appeal.

of the parties; where a disputed term is unambiguous, we presume its natural meaning to be conclusive evidence of such intent. *See id.* at 489–90.[5]

The terms of the Plan are found in Schlumberger's Employee Handbook and in its Personnel Administration Procedures Manual. The Employee Handbook provides in pertinent part:

Termination

Employment may be terminated for any number of reasons at any time, including retirement, resignation, discharge, or layoff....

Layoff

From time to time, Schlumberger may need to terminate an employee for lack of work, poor business conditions, or change in business focus. Should such termination become necessary, Schlumberger will provide all affected employees with salary and benefits continuation for a specified period of time.

The Personnel Manual elaborates further on these terms. It makes plain that "terminations" are either "voluntary" or "involuntary." Additionally, it states that "[t]here are two types of involuntary termination: Reduction in Force [and] Firing." Employees terminated due to a "Reduction in Force" are entitled to severance benefits:

Reduction in Force

From time to time, Schlumberger may need to terminate an employee for lack of work, poor business conditions, or change in business focus. Should such terminations become necessary, Schlumberger will provide employees with salary and benefits continuation for a specified period of time.

Employees who are laid-off are eligible for severance pay according to the enclosed schedule. The amount of severance pay is determined by the number of years of service with Schlumberger .....

When it becomes necessary, due to business conditions, to have a reduction in the workforce (layoff), the affected employees will be eligible for severance pay according to the schedule that appears below.

We agree with the finding of the district court that the above Plan language is clear and unambiguous as applied to the facts of this case and that it entitles appellees to severance benefits. As an initial matter, there can be no dispute that appellees were "terminated" within the plain meaning of the Plan. As it appears in the Plan, "termination" is defined broadly and encompasses those situations in which Schlumberger ceases to employ an individual. It is uncontested that Schlumberger ended its employment relationships with appellees. Moreover, Schlumberger sent written notice to appellees of their pending "terminations," thus confirming the nature of its action.

Additionally, there is no genuine dispute that appellees' terminations were involuntary. Schlumberger did not give appellees the option to remain as employees; they were to choose either resignation or employment with NSC.

Lastly, the record supports appellees' assertion that their involuntary terminations were caused by "lack of work," and thus constituted a "reduction in force" entitling them to severance benefits. The record indicates that appellees' terminations were precipitated by NSC's decision to discontinue its then existing maintenance contract with Schlumberger and by Schlumberger's subsequent decision to transfer appellees' maintenance work to NSC. Moreover, in July of 1989, Schlumberger's personnel manager informed appellees that Schlumberger was "transferring" responsibility for appellees' maintenance work to NSC, and at the same time told appellees that Schlumberger would not keep them on as employees. Schlumberger offers no significant evidence to counter appellees' assertion that they were terminated due to "lack of work." Hence, there is no genuine dis-

---

5. The Supreme Court in *Bruch* suggested that courts apply trust law principles in construing ERISA terms. *See Bruch,* 489 U.S. at 112, 109 S.Ct. at 954. Under such principles, interpretation of unambiguous terms also is limited to consideration of their plain meaning. *See* Restatement (Second) of Trusts § 164 Comment e (1959).

pute that appellees' terminations constituted a "reduction in force" within the meaning of the plan.[6] *See E.H. Ashley & Co., Inc. v. Wells Fargo Alarm Services,* 907 F.2d 1274, 1277 (1st Cir.1990) (once summary judgment movant avers absence of evidence to support opposing party's case, nonmovant "must reliably demonstrate that specific facts sufficient to create an authentic dispute exist").

Schlumberger raises numerous arguments in opposition to the findings of the district court. Only certain of these arguments warrant extensive discussion, and we address them accordingly.

■ Schlumberger's central proposition is that federal common law controls this action and mandates that "in a sale or transfer of operations such as in the instant case, employees who continue to perform substantially the same job under substantially the same working conditions without any loss of employment are not entitled to severance pay under ERISA." We disagree.

Federal courts have established no hard and fast rule that an individual must suffer a period of unemployment to qualify for severance benefits under ERISA. Those courts that have deemed unemployment a prerequisite to such benefits have predicated their decisions on the particular terms of the ERISA plan at issue and its application to the specific facts before them. *See Harper v. R.H. Macy & Co., Inc.,* 920 F.2d 544, 545 (8th Cir.1990) ("the plan's language does not permit an interpretation that employees who continue to work without interruption on comparable terms for the purchaser of their employer's business have been 'permanently terminated' by the sale"); *Rowe v. Allied Chem. Hourly Emp. Pension Plan,* 915 F.2d 266, 269 (6th Cir.1990) ("it is clear that, even under a *de novo* interpretation of the Allied Plan, the ... plaintiffs' separation from Allied and

immediate employment with Armco upon the sale of the Ashland Plant did not constitute a layoff" entitling plaintiffs to severance); *Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1149 (4th Cir.1985) (corporation did not abuse its discretion in determining that "job elimination" requirement for severance pay was not met by former employees who remained continuously employed after transfer of corporation's ownership); *Bowman v. Firestone Tire & Rubber Co.,* 724 F.Supp. 493, 502 (N.D.Ohio 1989) (severance denied to former employees of company division sold to another company where former employees took jobs with new company and where employee handbook explicitly exempted such individuals from receiving severance); *Lesman v. Ransburg Corp.,* 719 F.Supp. 619, 621 (W.D.Mich.1989) (individuals whose employment was terminated due to sale of entire business and who soon thereafter accepted comparable positions with purchaser were not entitled to severance pay from former employer since sale did not constitute "reduction in work force" within meaning of ERISA plan), *aff'd,* 911 F.2d 732 (6th Cir.1990).

Moreover, federal courts have found employees eligible for severance pay notwithstanding the fact that they did not experience a period of unemployment. *See Ulmer v. Harsco Corp.,* 884 F.2d 98, 102–03 (3d Cir.1989); *Harris v. Pullman Standard, Inc.,* 809 F.2d 1495, 1498 (11th Cir. 1987); *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1354–55 (9th Cir.1984).

Therefore, contrary to Schlumberger's contention, the only pertinent rule that emerges from the case law is that courts are to construe ERISA plans by employing accepted principles of contract and trust law. In applying such principles, we give preeminence to the natural meaning of ERISA plan terms, and we may not supplant such meaning with rigid definitions

---

6. Schlumberger asserts that it could have transferred appellees "to other work locations" within Schlumberger and that therefore a genuine dispute exists as to why it terminated appellees. However, we find scant evidence in the record that supports Schlumberger's contention. Schlumberger points only to conclusory, speculative deposition statements by an NSC employee, and references no specific statements by Schlumberger that it had "other work" available for appellees. Thus, Schlumberger fails to demonstrate specific facts sufficient to defeat appellees' motion for summary judgment.

or contrary interpretations offered by the parties. *See Bruch, supra,* 489 U.S. at 112, 109 S.Ct. at 954.

Schlumberger next takes issue with the district court's understanding of the plain meaning of the Plan. Specifically, Schlumberger assigns error to the district court's findings: (1) that appellees were terminated for "lack of work"; (2) that they were "laid off"; and (3) that they were "affected employees." Schlumberger essentially argues that since appellees were never unemployed, none of these terms applied to them. Having considered *de novo* the meaning of each of these terms as it appears in the Plan, we find no basis for Schlumberger's claims.

■ Schlumberger would have us construe the phrase "lack of work" as synonymous with unemployment. Such a construction can only be characterized as tortured. The Plan lists "lack of work" as one ground for involuntary termination of a Schlumberger employee. Thus, that phrase clearly refers to Schlumberger's own inability to supply work in sufficient quantity to justify keeping an employee on its payroll, not to an individual's employment status once he has been terminated from the company. *But see Simmons v. Diamond Shamrock Corp.,* 844 F.2d 517, 522–23 (8th Cir.1988) (accepting as reasonable a construction of "lack of work" that is similar to Schlumberger's).

■ Schlumberger also insists that the term "layoff" connotes a period of unemployment. Although "layoff" is susceptible of such meaning when considered in a vacuum, the term refers only to employment termination within the context of the Plan. Nowhere does the Plan suggest that a period of unemployment is necessary for a "layoff" to take place. To the contrary, the term is treated therein as synonymous with a "reduction in the work force." Thus, "layoff" clearly refers to Schlumberger's decision to release employees, and not to an individual's employment status once released from Schlumberger.

■ Finally, Schlumberger would have us construe "affected employee" as one who is unemployed as a result of his involuntary release from Schlumberger. Once again, nothing in the Schlumberger's severance policy suggests such a definition. As it appears in the Plan, the phrase refers simply to employees who are "terminated" due to "lack of work," and is not separately defined. To read anything more into this phrase by giving to it defendant's expansive definition would be to avoid the plain meaning doctrine altogether. Had Schlumberger wished to do so, it easily could have written into the Plan the severance policy it now seeks to employ. Instead, it attempts to extract such policy from language clearly not intended for that purpose.

■ Schlumberger next assigns error to the district court's failure to consider extrinsic evidence in construing the Plan. We find, however, that the district court was correct in declining Schlumberger's invitation to consider such evidence.[7] Basic contract and trust principles preclude federal courts from considering extrinsic evidence where the ERISA terms in question are unambiguous. *See Frank v. Colt Industries, Inc.,* 910 F.2d 90, 99 (3d Cir.1990) (uncommunicated intent not reflected in ERISA plan's language irrelevant in construing unambiguous plan terms); *Burnham, supra,* at 490 (citing *Boston Edison Co. v. F.E.R.C.,* 856 F.2d 361, 365 (1st Cir.1988)); Restatement (Second) of Trusts § 164 Comment e.

■ Finally, Schlumberger argues that the district court erred in failing to

---

7. Schlumberger contends, for example, that the court should have considered Schlumberger's own past practices. In particular, Schlumberger points to the fact that no severance benefits were paid to certain Fairchild employees who left Fairchild for Schlumberger in 1983. Even if the evidence were to be considered, it likely would be unpersuasive. Unlike the situation presented by the instant action, it appears that the 1983 transfer of employees was internal, that is, from one Schlumberger entity to another. Furthermore, there is no indication in the record that any Fairchild employees challenged that company's failure to pay them severance benefits. Therefore, the court would be reluctant to assign significant probative value to such evidence on this point, even if otherwise admissible.

give effect to personnel manager Yanoshak's oral representations informing appellees that they were not entitled to severance pay. In support of this argument, Schlumberger correctly points out that it was entitled to amend its written severance plan. *See Reichelt, supra,* at 430. However, the fact that any such amendment must be in writing makes Schlumberger's argument unavailing.[8] *See Frank, supra,* at 98 (written ERISA plan cannot be modified orally).

 Schlumberger's remaining arguments merit little discussion. Contrary to Schlumberger's contention, the district court did not err in applying Schlumberger's Statement of Material Facts to appellees' motion for summary judgment. It was within the district court's discretion to grant summary judgment against Schlumberger on the basis of Schlumberger's own version of the events at issue. *Cf. Rose v. Town of Harwich,* 778 F.2d 77, 82–83 (1st Cir.1985) (district court has discretion to enter summary judgment for nonmoving party), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986).

Schlumberger also incorrectly contends that the district court's failure to write separately on each of the parties' motions for summary judgment constitutes reversible error. Although the district court did not specifically note its ruling on each document, we are convinced that it "evaluat[ed] each cross-motion on its own merits." *Schwabenbauer v. Board of Educ. of City School Dist. of Olean,* 667 F.2d 305, 314 (2d Cir.1981). It was required to do no more.

Finally, we find no merit to Schlumberger's claim that the district court abused its discretion in applying its local rules. *See Hawes v. Club Ecuestre El Comandante,* 535 F.2d 140, 143–44 (1st Cir.1976) ("[federal district] court is vested with a large measure of discretion in applying such rules as it does promulgate").

The judgment of the district court is *affirmed.*

---

**8.** Schlumberger also alleges that it sent letters to one of appellees' coworkers and "to [appellees'] counsel" explaining its severance policy. Schlumberger contends that these writings constituted an amendment to the Plan. Schlumberger's argument is without merit since such amendment must be made in a manner prescribed by the Plan, *see* 29 U.S.C. § 1102(b)(3); *Frank, supra,* at 98, and there is no indication in the record that Schlumberger amended the Plan in any such manner. Therefore, even if these writings otherwise constituted a valid amendment, they did not effectively amend the Plan.