William PEHR, Individually, etc., Plaintiffs,

v.

UNIVERSITY OF CHICAGO, et al., Defendants.

No. 91 C 7698.

United States District Court, N.D. Illinois, E.D.

July 14, 1992.

Mark P. Cohen, Jack R. Epstein, Schoenberg, Fisher & Newman, Ltd., Chicago, Ill., for plaintiffs.

Patricia Costello Slovak, Gabriel J. Minc, Brodie G. Secrest, III, Kovar, Brittain, Sledz & Morris, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

William Pehr ("Pehr"), seeking to act not only individually but also "on behalf of all persons similarly situated," sues both the University of Chicago ("University") and its Employee Retirement Income Plan ("ERIP" or "Plan") for claimed pension plan benefits allegedly withheld by those defendants. Originally Pehr had tendered a pro se Complaint in December 1991 in which he asserted only his own claim. After he then made the necessary financial showing, this Court granted Pehr leave to

file in forma pauperis and appointed counsel to represent him.

On April 15 of this year the appointed counsel filed a two-count First Amended Complaint ("Complaint"), Count I of which stated Pehr's individual claim and Count II of which advanced an asserted class action claim. University and ERIP then filed a motion targeting both claims set out in the Complaint for alternative disposition via dismissal or summary judgment. Now the motion has been fully briefed, and for the reasons stated in this memorandum opinion and order:

1. Summary judgment is in order as to Pehr's Count I individual claim, and his individual action is dismissed with prejudice.

2. Pehr's Count II class claim is dismissed as well, but without prejudice to any claims that may hereafter be asserted by any other claimant in other litigation (no class having been certified).

### Facts [1]

Even though the litigants have provided this Court with a good deal in the way of detail, the really material facts are quite simply put. What follows, then, is a somewhat streamlined statement of events. This Court has of course reviewed and taken into account *all* of the evidentiary submissions—and no omission of any piece of evidence from this section or from the later substantive discussion should be mistaken as a failure to consider any aspect of either side's presentation.

Pehr was hired as a building engineer by University in August 1981, and he was always assigned to work in University's buildings that make up its medical center group. In October 1986 University formed a separate not-for-profit entity, University of Chicago Hospitals ("Hospitals"), as an affiliated corporation of which University is the sole member.[2] Then beginning in June 1987 University began to transfer various employees from its payroll to Hospitals' payroll—over 1,000 of them during the 18-½ months ended December 31, 1988.

Throughout the period of his employment Pehr (like other University employees) has been a participant in ERIP, a tax-sheltered annuity plan in which University (and now both University and Hospitals) as well as the participants make contributions to a defined benefit program and a defined contribution program. That participation on Pehr's part has been pursuant to collective bargaining agreements that General Service Employees Union Local No. 73, SEIU, AFL–CIO ("Union") had with University and that Union now has with both University and Hospitals. Union has continuously represented the bargaining unit of which Pehr has been a member from the very beginning of his employment.

Under ERIP's terms Pehr's benefits became vested on January 1, 1988.[3] On October 31 of that year the entire Physical Plant Medical Group of which Pehr was a member was transferred from the University payroll to Hospitals' payroll, but everything about Pehr's preexisting employment status remained without change after that transfer:

1. Pehr's period of service was continuous and uninterrupted, with his place of

---

**1.** Familiar Rule 56 principles impose on University and ERIP as movants the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to non-movant Pehr (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

**2.** "Member" is the term by which Illinois' not-for-profit corporation statutes identify each party in interest in such corporations, as contrasted with the stockholders of a for-profit corporation who own its residual value—something that by definition is inapplicable to the not-for-profit corporation.

**3.** Pehr Mem. 6 denied such vesting, mistakenly relying on 1975 Plan § 10.1 (which then required both five years' service and the attainment of age 40 as the conditions for vesting—as of the end of 1987 Pehr met the first but not the second of those requirements). But effective January 1, 1988 ERIP adopted a five-year cliff vesting schedule (Riesman Aff. ¶ 4), which immediately triggered such vesting for Pehr.

work, job duties, rate of pay, hours of work and supervisor remaining exactly the same after the transfer as they had been before.

2. Pehr's existing seniority date of August 24, 1981 also continued unchanged after the payroll transfer.

3. All of Pehr's accrued benefits—including vacation, sick leave and ERIP benefits—were neither lost nor diminished by reason of the transfer. All of those benefits continued to accrue thereafter based on his preexisting August 24, 1981 seniority date.

4. No requirement was imposed calling for Pehr to complete a new application form in order that he continue to participate in ERIP upon his transfer to Hospitals' payroll.

5. Under the collective bargaining agreement with Union, Pehr and other employees were entitled to four weeks' vacation after completing eight years of service. In 1989 Pehr in fact received four weeks of vacation, something that was consistent only with his service with University and then Hospitals being viewed as continuous.

In 1988 a joint agreement was negotiated among Union, Hospitals and University covering the transfer of the Physical Plant Medical Group employees from University to Hospitals. That joint agreement, and the ensuing collective bargaining agreements covering each entity, treated the change from one affiliated entity (University) to another such entity (Hospitals) as nothing more than a change in form—carrying with it such consequences as (1) combined seniority in applying for a vacancy to either entity, (2) recall rights for laid-off employees as though the entities were entirely fungible, (3) retained seniority and benefits for anyone who might transfer in either direction and (4) bumping rights applicable to either entity, no matter on which payroll the employee might be.

Pehr tries to raise a number of aspects of his transfer as somehow working a "termination" of his University employment. Not only does that mechanistic approach emphasize form at the expense of substance, but as explained a bit later it also glosses over the critical fact that the relevant terminology in ERIP speaks of termination of "service" and not termination of "employment"—and this opinion has already made clear, and will continue to point out, that Pehr's *service* in his job has never been interrupted.[4]

In any event, no analysis need be undertaken of some attempted distinctions raised by Pehr that are patently immaterial (examples of those are the obvious need to switch Pehr from one payroll to another or Hospitals' preparation of new W–2 and W–4 forms for his signature—the latter being required by the Internal Revenue Service simply because University and Hospitals are concededly different legal entities). Instead only the few items that may justify some explanatory comment will be mentioned:

1. Pehr was indeed asked to and did fill out a "Notice of Termination" form. But no substantive effects of his shift from University's payroll to Hospitals' payroll were reflected in the various places provided on that form to show any such changes, and most significantly the form's blank for listing the "Termination Reason Code" was filled in with a number that signified only "transfer."

2. Pehr also filled out Hospitals' "Application for Employment" form. But here too Pehr disclosed his own understanding of the situation by showing the following, in his own handwriting, as his "Reason for Leaving" University:

Transfer to med. center.

3. Some 60 days after Pehr's transfer ERIP was revised (effective on January 1, 1989) to add some additional benefits that had not previously been provided.

4. It should also be said at the outset that this opinion is not bottomed solely on that language difference. Instead that difference simply underscores the fundamental point, made at greater length throughout the discussion in this opinion, that no "termination" took place at all. Hence the result is the same no matter whether the issue is viewed as deciding upon the meaning of "termination of employment" or the meaning of "termination of service."

That 1989 revision (or perhaps more accurately total restatement) of the Plan also included this express confirmation in its Art. II ¶ 2:

> An Eligible Employee shall be determined under the following rules:
>
> \* \* \* \* \* \*
>
> 2. Employees of The University of Chicago Hospitals are eligible to participate in the Plan under the terms set forth in this document. The Plan shall be interpreted consistent with this intention.

And the definitions section (found in Art. XXIII) similarly included this provision:

> 11. University. The "University" is the University of Chicago. The University of Chicago Hospitals shall also be considered as the University where necessary in order to effectuate the intent of the Plan to permit employees of The University of Chicago Hospitals to participate.

But what is relevant is not the timing of that restatement—after all, Pehr was always treated by University and Hospitals (both before and after January 1, 1989) as continuously covered by ERIP in all events—but the fact that all benefits and calculations under ERIP have been and are made as though each participant's employment (including Pehr's) had been continuous with University and Hospitals as a single covered employer.[5]

In sum, the straws at which Pehr grasps would be too weak to sustain any weight even if the relevant test were termination of his "employment" rather than, as the Plan provides, termination of his "service." Pehr's purported distinctions are distinctions without a difference, amounting both individually and in the aggregate to a "so what?"

Not surprisingly, given the purely formalistic nature of University's change to the new two-entity structure (with the resulting transfers on the employment rolls), not one of the well over 1,100 employees who were involved in transfers between the two entities (including 39 who later transferred from University's payroll to Hospitals' between January 1, 1989 and March 1992, and 24 who transferred in the other direction during the same period) received any payment of his or her ERIP contributions on the theory that the transfers were viewed as "terminations." But Pehr, thinking to take advantage of his own nominal change in status by latching onto his accrued pension contributions, has demanded payment and then brought this suit.

To that end Pehr must attempt to rely on one of the following provisions of the 1975 ERIP (it should be noted, as already signaled in this opinion, that each of the provisions refers to the termination of a Participant's "service"):[6]

> 10.2 Termination Without Vesting
>
> If, for any reason other than death, the service of a Participant is terminated prior to retirement and before his rights to a Retirement Income based on the University's contributions are vested, he shall receive, in lieu of all other benefits under this Plan, a refund in cash of the aggregate of his contributions, with Credited Interest.
>
> 10.3 Termination with Vesting
>
> If, for any reason other than death, the service of a Participant is terminated on or after January 1, 1976, prior to retire-

---

5. Essentially Pehr attempts to seize on the fact that the Plan document had not formally been amended before the date of his payroll transfer—as though a snapshot taken on that transfer date would leave him in a noncovered status. But the short answer is that Pehr was not treated in that fashion. Instead the January 1, 1989 revision simply memorialized the treatment that University and Hospitals had already extended to all of the employees (over 1,000 of them, as already stated) who had been shifted to Hospitals' payroll during the preceding 18-½ months.

6. Because of Pehr's period of service with University, ERIP has treated Pehr as having a vested right to retirement benefits, so that Subsection 10.3 would be the relevant provision. To be consistent with his other arguments, Pehr must and does urge that his rights are not vested, thus bringing Subsection 10.2 into play instead. As n. 3 reflects, Pehr is wrong on that score (as he is on all others). But because the contractual criterion is the same under either provision quoted in the text—each speaks of the termination or nontermination of Pehr's "service"—the result is the same in all events.

ment and after his right to a retirement income based upon the University's contributions is vested, ... the employee may elect, by written notice to the University, to receive a refund in cash of the aggregate of his contributions, with Credited Interest, in which event he shall retain a right to a retirement benefit based on the University's contributions, as determined by the University consistent with any applicable law and regulations.

But what Pehr prefers to and does ignore are these other (and controlling) aspects of ERIP:

1. Its 1975 version, which was in place at the time of University's corporate reorganization pursuant to which it first formed and then staffed Hospitals as an affiliate to conduct the hospital operations, contained this express provision:

16.1 Successor Employer

In the event of the dissolution, merger, consolidation or reorganization of the University, provision may be made by which the Plan and Contract will be continued by the successor, and, in that event, such successor shall be substituted for the University under the Plan. The substitution of the successor shall constitute an assumption of Plan liabilities by the successor and the successor shall have all of the powers, duties, and responsibilities of the University under the Plan.

2. From the inception of that reorganization and the concomitant payroll transfers, Hospitals (like University before it) treated itself as the employer of the transferred employees and fully subject to ERIP. Then the January 1, 1989 restatement of the Plan, which as already stated included a provision that expressly confirmed the eligibility of Hospitals' employees to participate in the Plan, was also expressly made applicable "to individuals employed on or after January 1, 1989"—a description that unques-

tionably embraced Pehr and all other previously transferred employees.

### *Pehr's Claims*

Count I

■ Any participant in a qualified pension plan may bring an ERISA action to recover benefits due to him or her (29 U.S.C. § 1132(a)(1)(B)[7]). One circumstance that obviously triggers such benefits is a participant's departure before retirement if his or her benefits have vested at that point.

■ It would be purely and simply a distortion of the real-world facts to treat the purely administrative transfer that took place here as a "termination" under ERIP § 10.3 (or for that matter under ERIP § 10.2, as Pehr would mistakenly have it). Although neither side has come up with any ERISA case law (or for that matter, any other case law) dealing with the question, University has cited an IRS general counsel's memorandum, GCM 39824 (July 6, 1990), reported in CCH Pension Plan Guide ¶ 17,524 at 20,985–95, that reaches the same "no" answer that common sense would dictate (cf. also Rev.Rul. 79–336 (1979–2 C.B. 187), updating and restating Rev.Rul. 72–440 (1972–2 C.B. 225), following the same line of analysis in dealing with the similar though not identical concept of separation from service in determining the tax treatment of rollovers and lump sum payments in case of payroll transfers to an affiliated corporation involving no change in job).

Pehr's counsel seek to call upon *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26 (1st Cir.1991) as authority supporting his position. But *Bellino* involved a wholly different situation—one in which Schlumberger had been providing its own employees to act as maintenance workers under a contract requiring it to provide such services to an unrelated company, National Semiconductor Corporation ("NSC"). When NSC then decided that it would make more sense to do the maintenance work in-house and it notified Schlumberger that it

---

**7.** All ERISA citations will take the form "ERISA § —," referring to the statutory numbering within Title 29 rather than to ERISA's internal numbering.

was cancelling the contract between them, Schlumberger and NSC negotiated a deal under which Schlumberger's employees (whom it therefore had to terminate for lack of work) would be encouraged to go to work for NSC instead—indeed, the companies agreed that Schlumberger would get $5,000 for each of its employees who accepted NSC's offer and went to work for the latter (944 F.2d at 28).

What was at issue in *Bellino* was the "transferred" employees' right to contractual severance pay under Schlumberger's preexisting contractual commitment to make such payments. Understandably the Court of Appeals held that Schlumberger's denial of such severance benefits to departing employees who had received offers from NSC for comparable jobs—something that was "contrary to the plain language of [Schlumberger's] Plan" (*id.* at 29)—could not be justified. So far as *Schlumberger* was concerned the employees were terminated because of "lack of work" (that was the language of the severance pay contract, *id.* at 30), so that the employees won and Schlumberger lost.

It takes only that recital of the facts to demonstrate *Bellino*'s total inapplicability to the situation here—to University's purely internal restructuring. Just as *Bellino* described Schlumberger's attempted reading (or rather misreading) of its unambiguous ERISA plan documents as "tortured" (*id.* at 32), so Pehr and his lawyers would inflict like torture on the unambiguous language of ERIP.

What has been said to this point is enough to dispatch Pehr's principal claim—that in which he seeks payment from the Plan. In what might be viewed as an attempt at overkill, however, University Mem. 10–11 also points out that the acceptance of Pehr's contention would have required it to treat every other transferred employee in the same way if it were to avoid a claim of discriminatory treatment (in that respect, *Adams v. Ampco–Pittsburgh Corp.*, 733 F.Supp. 998, 1001 (W.D.Pa.1989) holds that an employer's uniform denial of termination pay in earlier comparable situations would also lend support to its current interpretation of its ERISA plan provisions). That of course is somewhat of a bootstrap argument, so it will not be relied on by this Court—what controls here instead is the objective *correctness* of University's and Hospitals' treatment of Pehr, and thus of the other transferred employees as well. And that correctness is manifest.

Finally, Pehr's added claim that University and ERIP violated Plan § 12.3 by purportedly failing to give Pehr notice of their denial of his substantive claim, thus triggering their liability for payment of a statutory penalty under ERISA § 1132(c), falls of its own weight. It is defeated by the express holding in *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 622–24 (7th Cir.1987). Under *Kleinhans, id.* at 623 Pehr's demand for *payment* in his Complaint ¶ 11 did *not* constitute a "request for information" so as to bring ERISA § 1132(c) into play.[8]

### Count II

Pehr also purports in his separate Count II—at the instance of his appointed counsel—to act on behalf of a class of University employees who underwent similar payroll transfers to Hospitals. This

---

**8.** Pehr's Mem. 11–12, filed in opposition to the current summary judgment motion, has for the first time raised a further assertion that his request for information about his contributions was purportedly denied him. That assertion is both ill-timed and ill-conceived, bordering on frivolousness (if it does not indeed cross that border). Pehr's own initial self-prepared Complaint included as its Exhibit A a report of his contributions and benefits that had been afforded him for the year ended December 31, 1988. Moreover, the affidavit of University's Director of Staff Benefits Robert Riesman—filed together with defendants' Reply Memorandum after Pehr had raised the issue for the first time—also defeats that belated contention in factual terms:

> 5. Prior to June 11, 1991, I consulted with Samuel Golden, of the University's Office of Legal Counsel, concerning an inquiry for contribution information from an attorney representing Mr. Pehr. My staff supplied Mr. Golden with printouts showing Mr. Pehr's contributions and interest and I received a copy of a transmittal letter from Mr. Golden to Mr. Pehr's attorneys.

Court is of course well aware of the mandate of Rule 23(c)(1) that district courts are to determine the maintainability of putative class actions "[a]s soon as practicable after [their] commencement...." It normally conforms meticulously to that mandate and to the case-law-established corollary that a court's decision on what is commonly termed class certification should not address the merits of the litigation (*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974)).

■ But there is something very disquieting about the notion that a court must *always* accord first priority to the issue of class action certification—at least no such treatment seems called for in situations where as here (1) the plaintiff's own individual claim appeared from the outset to be wholly without merit even in facial terms and (2) the defendant is not urging that it should get the benefit of a favorable determination on the merits against all members of the putative class (that would be the effect of a class-action certification followed by the court's ruling on the substantive claim). If the *defendant* is not concerned on that score—whether because it believes that it is unlikely to be the target of repetitive claims (probably because of the total lack of merit that it perceives in the claim) or otherwise—it is difficult to see any legitimate complaint about the court's prompt addressing of the merits (or far more likely the lack of merit) of the individual plaintiff's position.[9] On the other side of the coin, if the defendant wins on the merits against the original plaintiff *without* the benefit of a prior class certification, it cannot then urge defensive claim or issue preclusion against any other plaintiff who may sue on the same type of claim later.

In a sense the filing of a class action is something like forming a corporation. Tax and corporate practitioners know that the latter procedure is virtually costless, both because of the ease of corporate formation and because both the formation and the funding of the corporation are tax-free. But getting *out* of a corporate structure once it is in place can be painfully expensive in terms of the income tax consequences. Hence the knowledgeable practitioner approaches corporate formation gingerly and not as a casual and thoughtless decision.

Just so with the class action. It is all too easy to throw the necessary allegations, including those supporting the Rule 23 preconditions to certification, into a complaint. That too is a seemingly costless step. But once the class environment is created, extricating oneself from the resulting procedural entanglements can be most troublesome—consider, importantly, the mandate of Rule 23(e) that prohibits the dismissal or compromise of a class action without court approval and that requires that all class members must be given notice of the proposed dismissal or compromise in such a manner as the court may direct. Small wonder that Professor Arthur Miller some years ago uttered a kind of think-before-filing caution as to class actions (see his *An Overview of Federal Class Actions: Past, Present & Future,* 4 Just.Sys.J. 197, 208–09, 215 (1978)) that has since become a general principle embodied in Rule 11—this

9. Indeed the defendant, as well as any putative class member, is at substantial risk under those circumstances. For one thing, if a defendant's judgment about the strength of its position on the merits were to prove wrong and if it were therefore to lose instead of winning as it expected, principles of offensive issue preclusion (often termed offensive collateral estoppel) would most likely make that defendant a loser again as a matter of law if and when others with the same type of claim were to bring suit (*Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331–33, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979)). And second, the passage of time during the pendency of the first lawsuit, with its unresolved class action claim, would toll the statute of limitations as to prospective class members who might seek to bring their individual lawsuits later (*Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 2397–98, 76 L.Ed.2d 628 (1983)). Although the *Glidden* opinion referred to later in the text spoke of those factors from the perspective of non-notified (and hence absent) prospective class members (808 F.2d at 627), it cannot be gainsaid that in the most probable cost-benefit analysis the course of action chosen here is preferable.

time on pain of suffering sanctions for not doing so.

In terms of the present case, it has made good sense for this Court to address Pehr's individual cause of action rather than embarking on the class certification issue. Indeed, Pehr's appointed counsel have indirectly confirmed that by not having devoted even a single sentence of their over–12–page responsive memorandum to the class-action claim, even though defendants had specifically addressed Part IV of their opening memorandum to that subject (D.Mem. 12–13).[10] To assure a final order terminating this litigation, this Court dismisses Complaint Count II, the prospective class-action count (see *Glidden v. Chromalloy American Corp.*, 808 F.2d 621 (7th Cir.1986)—but because there has been no certification of a class here, such dismissal is of course without prejudice to any other putative class member's future effort to assert any claim against University or ERIP.[11]

*Conclusion*

There is no genuine issue of material fact, and University and ERIP are entitled to a judgment as a matter of law on Pehr's Count I. Pehr's individual claims are dismissed with prejudice. As for Count II, for the reasons already stated that Count is

dismissed without prejudice to any future effort by a putative class member other than Pehr to assert any claim against University or ERIP.

---

10. That dead silence is especially disturbing, given the fact that the whole idea of a class claim appears to have come from the lawyers in the first place (it will be recalled that Pehr's initial pro se Complaint—one that was articulately drafted—had contained no claim other than his own). In that respect, it might also be observed in passing that the Count II claim in the First Amended Complaint has been stated in an impermissible way to begin with: It purports to identify *two* subclasses, one of them comprising transferred employees whose Plan benefits were not vested (Count II ¶ 17) and the other consisting of those whose benefits had vested at the time of transfer (*id.* ¶ 20). Whether Pehr has been accurately labeled as coming within the second of those groups or (as he and his lawyers mistakenly contended) should be placed within the first group, he could not sue as a class representative for the group of which he is *not* a member—both for lack of Article III standing (*Kedziora v. Citicorp Nat'l Servs., Inc.*, 780 F.Supp. 516, 522–23 (N.D.Ill.1991) and because he could not satisfy the Rule 23(a)(3) requirement of "typicality" (*Wesley v. GMAC,*

No. 91 C 3368, 1992 WL 57948, at *3–4, 1992 U.S.Dist. LEXIS 3594, at *13–14 (N.D.Ill. Mar. 19, 1992)).

11. In *Glidden* the district court had granted summary judgment on plaintiff's individual claim but had neither certified the class nor acted on the class claim, thus preventing the judgment on the individual claim from becoming final and hence appealable. Speaking in that entirely different context, *Glidden, id.* at 627 remarked on the possible injury to the class by a dismissal of the class claim at the instance of the individual plaintiff. But where the non-pursuit of class certification is occasioned by the exceedingly clear want of substantive merit in the claim—where the result of earlier class certification would have been an adverse decision binding every class member—it is difficult to place any value on those people being told about a fellow employee's having brought such a claim. Indeed *Glidden, id.* at 627–28 recognizes that notice is not always necessary to protect the class, and this Court has so concluded here.