Louis DeSIENO, Plaintiff,

v.

AMERICAN HOME PRODUCTS,
Defendant.

C.A. No. 97–11437–NG.

United States District Court,
D. Massachusetts.

Sept. 28, 1998.

Richard A. Sypek, Ross & Ross, Springfield, MA, for Plaintiff.

John F. Adkins, Bingham, Dana & Gould, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

Plaintiff Louis DeSieno ("Louis" or "Louis DeSieno") brings this suit against American Home Products ("American Home"), the successor-in-interest of his deceased mother's former employer. He is seeking survivor benefits he believes he is owed under his mother's pension plan. The underlying documents establishing the pension plan and outlining the benefit options chosen by Louis' mother Marie DeSieno ("DeSieno") are undisputed. Each side has moved for summary judgment, based on its interpretation of those documents.

## I.   UNDISPUTED FACTS

Marie DeSieno began work for the defendant's predecessor company, Breck Corporation, in 1961. Breck Corporation later became American Cyanamid Corporation ("American Cyanamid"). It was while DeSieno was working for American Cyanamid that most of the relevant facts took place. In 1996, American Cyanamid merged with the defendant, American Home Products ("American Home").

### A.   The Relevant Plan Documents

On December 9, 1980, DeSieno's husband, Louis' father, died. DeSieno was living with her son, Louis, at the time. On March 6, 1981, DeSieno filled out a form entitled "Employees Retirement Plan Notice of Exercise of Ten–Year Certain and Continuous Option." This notice was directed "To the Pension Committee" and stated:

> I hereby exercise the Ten–Year Certain and Continuous Option described in Article Six of the above Plan, and hereby designate the person named below as my Beneficiary to receive after my death, if I should die after the "effective date" of this Option (as specified below) and before I have received 120 reduced monthly benefit payments after such date, the balance of those 120 monthly payments.

Louis was identified as the beneficiary, and the effective date was listed as February 24, 1981. The form concluded with the sentence, "I understand that my exercise of this Option and its effectiveness are subject to all of the provisions of the above Plan."

The "Article Six" to which the form refers is entitled "Payment of Benefits" and begins on page 15 of the version of the American Cyanamid Company Employees Retirement Plan ("the Plan") in effect in March 1981. Article Six covers the following subjects: Normal Benefits and Single Life Annuity (Section A); Contingent Annuitant Options (Section B); Ten–Year Certain and Continuous Option (Section C); Elections of Benefits, Application (Section D); Total and Permanent Disability (Section E); Authorized Payments (Section F); Adjusting of Benefits (Section G); and Commuting of Benefits (Section H).

The Article Six incorporated by reference into the "Notice of Exercise of Ten–Year Certain and Continuous Option" form describes the option as follows:

> Upon written notice to the Administrator, a member [of the Plan] who has vested rights under Paragraph C of Article Five [1] may exercise the option to convert the retirement annuity otherwise payable to him [sic] after retirement into reduced annuities ... payable, in accordance with the provisions of this Paragraph C, to him until his death and thereafter, in the event that he has died (i) after the effective date specified in his notice (which *must* be the first day of any month following his 50th

---

1. Paragraph C of Article Five provided that Member's rights vested after she had 1) been employed by the company for five years and 2) her age and years of service together totaled 65.

birthday and his attainment of vested rights but not after his *Mandatory* Retirement Date) and (ii) before he has received one hundred twenty (120) monthly payments after the effective date for the balance of said one hundred twenty (120) monthly payments to a beneficiary .... (emphasis in original)

### 1. *Provisions Regarding the Effective Date*

The defendant contends that there were two "ten year" options, one only valid as a death benefit if the employee died prior to retirement, and the other a post-retirement pension payment plan. The effective date the employee specified, according to the defendant, determined which option had been chosen; if she specified a pre-retirement date, she had chosen pre-retirement death benefits, if a post-retirement date, a pension payment plan.

By its explicit terms, however, Article Six did not require any particular effective date or hint that the nature of the benefit would be determined by the date chosen. Instead, it allowed the employee to choose the first day of "any" month following her 50th birthday and the attainment of vested rights, but not after the mandatory retirement date. Applying this rule to DeSieno, her effective date was required to be the first day of *any month* following both her 50th birthday (December 29, 1977) and her attainment of vested rights (December 29, 1976),[2] but before her mandatory retirement date of January 1, 1997.[3]

Other references to the effective date only dealt with its effect on the payment or accrual of benefits: If the retirement annuity began to accrue before the effective date—that is, if the employee retired before the effec-

tive date[4]—the annuity would not be reduced until after the effective date; if the Member died after the effective date but before the benefits began to accrue (before retirement), the reduced annuity payable to the beneficiary would begin to accrue the following month; if the Member died before the effective date, the option would be "without effect."

Nowhere does Article Six state that the "ten year" Option could refer to *either* a death benefit *or* a pension payment plan, depending on the effective date chosen. The first paragraph of Article Six described the "Normal Benefits and Single Life Annuity," and informed the employee, "a member's ... retirement benefit will be paid, *unless such member or former member elects ... to receive his retirement in some other form* permitted by the Plan, in the form of a single life annuity for the life of such member ...." (emphasis added). The other forms are then described in their own separate section, including the section on the "ten year" Option discussed above.

### 2. *Lapsing of the "Ten Year" Option Election Upon Retirement*

The defendant also argues that, since DeSieno chose a pre-retirement "ten year" Option, she was obligated to make another election upon her retirement. Since she did not make a second election, her annuity reverted to the normal "Single Life Annuity" form, and did not survive her death. I therefore now turn to the Plan's language regarding when employees were required to make their pension option elections, and, in particular, whether options made before retirement had to be renewed or reaffirmed upon retirement. Plan language setting forth such a requirement might reflect either expressly or impliedly the defendant's contention that cer-

**2.** An affidavit submitted by the defendant's Director of Pension Administration, Richard A. Van Kampen ("Van Kampen"), states that her rights vested in January 1979, when her age and her years of service totaled 65. However, from my calculations, the vesting date was actually December 29, 1976, when she had over 15 years of service—April 24, 1961–December 19, 1976— and was 50 years old. This discrepancy, however, is not material.

**3.** The first day of the next month following her 70th birthday, pursuant to Plan Article Four, Paragraph A.

**4.** Article Six of the Plan provided, "[t]he retirement annuity of a Member will begin to accrue on the date when he reaches his Mandatory Retirement Date [age 70], or, if earlier, on the first day of the month next following the termination of his employment on or after his Normal Retirement Date ...."

tain options selected prior to retirement were, because of when they were selected, death benefits only.

Article Six's description of the "ten year" Option did not link the effectiveness of the election to whether it was made before or after retirement. On the contrary, it stated that employees were only permitted to select the option prior to the accrual of their benefits, that is, prior to their retirement. Nor was there a statement that the election, if made prior to retirement, would have to be reaffirmed upon retirement. Rather than establishing an automatic termination date for the effectiveness of the election, the Plan set out a specific rule for its termination, implying that if the option was not terminated in accordance with these rules, it would continue in force.[5]

The time frame for choosing an option other than the normal one is contained in the description of the "Normal Benefits and Single Life Annuity" at the beginning of Article Six: the option had to be chosen prior to the accrual of benefits and "within any other time limit specified in the Plan . . . ." Logically, to look for "any other" time limits necessary for electing the "ten year" Option, one would turn to the "ten year certain and continuous option" section of the same article. As noted above, that section never suggested that the election be made after retirement. On the contrary, the Election of Benefits section, ¶ D, states that the period in which an employee may elect benefits options normally ends upon termination of employment, at which point the election can no longer be revoked. (¶ D(2))

Perhaps most relevant, given the defendant's contention that DeSieno's 1981 election automatically expired upon her retirement, is the Plan's provisions for revocation of a pension option. Paragraph D(6) of Article Six provides:

No benefits under the Plan need be paid to a member until the member has applied therefor in writing, specifying the payment option elected (*if not previously specified*) . . . . If an application for benefits is re-

ceived which is complete except that no payment option is specified, benefits shall be paid in the [single life annuity] form . . . *unless the member . . . has previously specified, and not revoked, another form.* (emphasis added).

This appears unambiguous: a member's previous specification of a payment option could continue to be effective upon her retirement; indeed, it would be automatically applied if it were neither revoked nor superseded by a new election.

### 3. The Summary Plan Description

The Summary Plan description circulated to all employees reiterated the Plan provisions in simpler language. It stated: "If you are *single* when Plan payments start, you *automatically* receive your pension in the form of a Single Life Annuity—*unless you elect otherwise.*" (emphasis in original) The Ten Year Certain and Continuous Option was described as one of two "Optional Forms of Payment": "This option pays you a reduced income for life but guarantees payments for ten years. If you die before 10 years are up, your beneficiary will receive your reduced income for the balance of the 10 years." Again, the effective date of the option was required to be the first day of *any* month following the election and prior to the beginning of pension payments. The election, the employee was told, had to be in writing, as did any "cancellation or change."

The summary plan description also mentioned the possibility of "Preretirement Death benefits." These benefits allowed for payment of benefits to a designated beneficiary in the event that the employee died before retirement or before the pension began. These benefits were purely elective for those, like DeSieno, who were unmarried. They also carried a Ten Year Certain and Continuous Option, providing for payments to the beneficiary for ten years after the employee's death. The language describing the effective date is identical to that describing the effective date for the "ten year" Pension Option: "The effective date *must* be

---

5. Once the option had been chosen, it could be terminated at any time prior to the effective date

or the accrual of benefits, whichever was later.

the first day of any month following the date of your election, but not later than the date your pension starts." (emphasis in original). If the effective date determined which of the two "ten year" Options the employee was choosing, there is no indication of that here.

It is only in the Summary's description of the preretirement death benefits, out of all the Plan documents, that there is a reference to an option that automatically terminates upon retirement. The Summary states: "These options remain in effect until your mandatory retirement date—or the date Plan payments start, if earlier."

### B. *Correspondence Between American Home and DeSieno*

From the record before me, it does not appear that DeSieno received any further descriptions of the Plan or the option she had chosen until the year before her retirement. On January 26, 1989, DeSieno received a form from American Cyanamid estimating the pension that she would receive under the various options available to her. The form was entitled "Pension Estimate" and stated under the heading *"MEMBER CURRENTLY HAS EXERCISED"*: "10CC Option–Son."

On January 15, 1990, DeSieno's position was eliminated. She was 62 years old at the time. On January 23, she received a form letter, clearly not individually tailored to DeSieno because it referred to her "spouse" and outlined various benefits available "depending on your marital status," while she had been a widow for ten years. In that form letter, she was told her pension would be $379.00, the same amount shown on the 1989 "Pension Estimate" that listed her as having chosen the "ten year" Option for her son.

The January 23, 1990, letter also mentioned that there are "certain surviving benefit options" available and attached description of them. The attachment contained a description of the "ten year" Option identical in substance to that on the form DeSieno had filled out in 1981. Although the letter ended with the statement "Before your pension payments begin, you will be given another opportunity to elect a postdraw survivor option," it nowhere refers to pre-retirement

death benefits or suggests that any previously selected options might have been automatically invalidated. The only reference to the pension being payable only until DeSieno's death was in the obviously inapplicable sentence, "Your estimated pension from the Plan ... will be $379.23 a month, payable only during your lifetime assuming, *if you are married, that your spouse waives the Mandatory 50% Spouse Option which is described later in this letter.*"

DeSieno chose to have her pension begin on June 1, 1990. She checked off a box stating, "I have already reviewed the option description, and my election is submitted herewith." She did not submit an option selection, believing, according to her son, that the option selection she had made in 1981 was still valid. The response from American Cyanamid's (now American Home's) Director of Pension Administration, Richard A. Van Kampen ("Van Kampen"), would only have confirmed this belief. The three line letter stated, in its entirety:

> We have received your application requesting that your pension benefits commence effective June 1990.
>
> *The purpose of this letter is to inform you of the survivor option you elected when you submitted your application for pension.*
>
> *You elected the option,* which means that you will receive a lifetime payment of 428.11 per month. (emphasis added).

Viewed with hindsight, the letter is somewhat confusing. It refers twice to DeSieno having, in fact, selected a survivor option, but then refers in the final line to a "lifetime" payment. The payment is also higher than that she had been told she would receive the year before and in the letter of January 15; it is even higher than the "no option" maximum rate on the form she received in 1989. Nonetheless, to someone who had filled out a survivor option form, the statement "you selected the option" would clearly confirm that the option was in effect.

DeSieno died on December 2, 1996, and the monthly pension payments she had been receiving came to an end. American Cyanamid (by then merged into American Home)

took the position that DeSieno had selected a lifetime annuity only. Louis DeSieno spoke to Van Kampen on the phone about the matter and Van Kampen said he would look into it. Louis then retained a lawyer, who sent the company a demand letter and eventually brought this suit.

## II. *LEGAL STANDARD*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In evaluating the record, the court views the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996).

The moving party must make an initial showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If it does so, then the burden shifts to the non-moving party to set forth specific material facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a party resists summary judgment by pointing to a factual dispute on which it bears the burden at trial, that party must point to evidence affirmatively tending to prove the fact in its favor. *FDIC v. Elder Care Servs., Inc.*, 82 F.3d 524, 526 (1st Cir.1996), *cert. denied*, 516 U.S. 1113 (1996).

## III. *ANALYSIS*

### A. *Exhaustion of Remedies*

■ ERISA mandates that all employee benefit plans provide participants with access to an internal procedure for the "full and fair review" of any denial of benefits. 29 U.S.C. § 1133. Out of this right to review, courts have crafted a duty, barring access to federal court to those who have not sought review of

a denial of benefits within the plan administration. *See Drinkwater v. Metropolitan Life Insurance Co.*, 846 F.2d 821, 825–26 (1st Cir.1988), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *King v. James River–Pepperell*, 592 F.Supp. 54, 55 (D.Mass.1984). There is an exception to the exhaustion requirement where appeal through the internal review system would not provide the "full and fair review" required by law or would otherwise be futile, *Drinkwater*, 846 F.2d at 826.

The review procedure under the American Cyanamid plan is contained in Article 10, paragraph J of the Plan. It allows any "claimant" denied plan benefits to review all relevant documents and, within 60 days of receiving written notice of a claim denial, request a review of the denial in writing. The claimant may submit written "issues and comments" to the Administrator for "consideration," but there is no right to any hearing, meeting, or personal appearance. The Administrator is required to give "due consideration" to the written submission and issue a decision written in language that can be understood by the claimant, including specific reasons for the decision and references to the relevant plan provisions. Article 10, para. J. Technically, the Plan "administrator" is a committee, but it has delegated most of its review powers to Van Kampen. Van Kampen Aff. ¶ 33.

Louis DeSieno did not follow the formalities of the review procedure. After both he and his attorney had spoken to Van Kampen by telephone, Van Kampen asked them to submit their comments in writing. Van Kampen reviewed those comments and reaffirmed the denial of benefits. Although further review was available through an appeal to the Plan committee, American Home stipulated at oral argument that it would have upheld Van Kampen's decision unless Louis DeSieno had come forward with additional facts and documents that Van Kampen had not reviewed. In exchange for a stipulation that nothing was being presented to this Court that had not already been presented to Van Kampen, American Home voluntarily stipulated that there was no exhaustion issue

in this case. With that stipulation by both parties, I therefore turn to the merits.

### B. *The ERISA Standard of Review*

■ In interpreting the powers and duties of an ERISA fiduciary, I am guided by principles of federal trust law. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). According to those principles, if the Plan itself gives the administrator discretionary or final authority to construe doubtful plan terms, courts may review such constructions only for abuse of discretion. *Id.* at 111, 109 S.Ct. 948.

■ Yet this review, although deferential, is nonetheless meaningful. ERISA was "enacted to promote the interests of employees and their beneficiaries in employee benefit plans ... and to protect contractually defined benefits." *Firestone*, 489 U.S. at 113, 109 S.Ct. 948 (internal quotation marks and citations omitted). In furtherance of the first purpose, the statute charges Plan administrators to act solely in the interest of the Plan and its beneficiaries. 29 U.S.C. § 1104. Even the review for abuse of discretion is *de novo*, in order to assure the trustee's compliance with that duty. *Recupero v. New England Tel. & Tel.*, 118 F.3d 820, 827 (1st Cir.1997). In furtherance of the statute's second purpose—protecting contractually defined benefits—ERISA requires administrators to discharge their duties in accordance with the Plan documents. 29 U.S.C. § 1104(a)(1)(D). A court may reject as arbitrary and capricious an administrator's interpretation of the Plan that varies from the "unambiguously manifested meaning" of the Plan language. *Recupero*, 118 F.3d at 827.

■ Under federal trust law, the interpretation of trust documents must "embody common-sense canons of contract interpretation." *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 29 (1st Cir.1991). If a term is unambiguous, its plain meaning is conclusive. *Id.* at 30. The employer may not attempt to vary that term by urging the court to take into account its uncommunicated intent behind the language, *Frank v. Colt Indus., Inc.*, 910 F.2d 90, 99 (3d Cir.1990), or extrinsic evidence of company practices not memorialized in the documents. *Bellino* 944 F.2d at 32 & n. 7.

■ The powers of the administrator under the American Home Plan are set out in Article 10:

> He shall interpret the Plan and decide any and all matters arising hereunder, and shall have the right to remedy possible ambiguities, inconsistencies or omissions herein, and his decision or action in respect thereof shall be conclusive and binding upon all past, present and future employees and their ... beneficiaries ...; provided, however, that all such interpretations and decision shall be applied in a uniform manner to all employees similarly situated.

Van Kampen, under powers delegated by the Plan administrator, was thus given discretionary authority to interpret ambiguous Plan terms, and I must accordingly review his denial of benefits to the plaintiff only for an abuse of discretion.

### 1. *The Plan Language*

■ The plaintiff's case turns on the meaning and effect of the March 6, 1981, form completed by DeSieno. Louis contends that in filling out that form, his mother intended to elect the "ten year" *pension* option on March 6, 1981, naming him as a beneficiary. It is undisputed that she never revoked this option, nor was she informed that it would terminate upon her retirement. Therefore, the plaintiff argues, when DeSieno returned her pension application in 1990, stating that she had already made an election, that the 1981 survivor option should have governed, either because it was still in effect, or because her statement that she had selected a survivor option should have put the company on notice that she meant to refer to and revive her prior choice.

Defendant's counter-argument hinges on the claim that the form is not what it appears to be. The form DeSieno completed, Van Kampen explains, referred not to pension benefits but to a pre-retirement death benefit option. As such, the election did not survive her retirement from the company. Had she wanted to elect the "ten year" Option for her

post-retirement *pension,* she should have done so in 1990. When she did not, her pension was paid under the automatic default option—a single life annuity that terminated upon her death.

The defendant's argument runs afoul of the plain meaning rule that governs ERISA plan interpretation. *See Bellino,* 944 F.2d at 32. The form that DeSieno signed in 1981 is entitled "Employees *Retirement* Plan" and was addressed "to the *Pension* Committee." By its own terms, it could not have referred to benefits payable if the employee died prior to receiving a pension, because it provided for payments to the beneficiary "if I should die after the 'effective date' of this Option . . . and before I have received 120 reduced monthly benefit payments . . . ." If it only applied to pre-retirement death benefits, the reference to the possibility of the employee having already received some portion of the 120 payments on the date of her death would have been nonsensical.

American Home explains this anomaly by reference to a company practice described nowhere in the Plan documents. It claims that a single pre-printed form was used both for the pre-retirement annuity and the pension option, and the only way to tell which an employee had chosen was by reference to the "effective date." The "Effective Date," according to Van Kampen, "indicated which type of option the employee had selected. By specifying an effective date of February 24, 1981, which was during and not after her employment, Mrs. DeSieno elected a pre-retirement option."

There are fundamental problems with this assertion. First, Van Kampen cites no specific Plan language making the distinction between pre-retirement and post-retirement benefits contingent on the effective date specified. As described above, a reading of the form itself would indicate that it refers to post-retirement *pension* benefits. Any ambiguity in the form—an ambiguity, it should be noted, not apparent on the face of the form itself but created by American Home's post hoc explanation of its meaning—would be resolved, under ordinary contract principles and ERISA's plain language rules, by resort to the Plan documents it incorporates by

reference. If there is any language that overrides this apparently clear provision and converts what appears to be a pension election into a pre-retirement death benefit election merely because of the effective date, it was not pointed out either in American Home's papers or at oral argument. This Court's independent reading of the Plan documents and the Summary Plan Description turned up no such rule anywhere in print in either document.

Article Six of the Plan, however, gives no indication that a form entitled "pension" and describing benefits to be paid after the employee's retirement was automatically converted into a pre-retirement death benefit by virtue of the effective date chosen. As described above, Article Six appears to give the employee a wide range in choosing the effective date: anytime after her 50th birthday and the vesting of her pension rights and before her 70th birthday—for DeSieno, the first day of any month between December 29, 1976, and January 1, 1998. As in the Summary Plan Description, the document refers to the first day of "any" month. The word "any" is not susceptible to many interpretations. It leaves no room for hidden qualifications and conditions. As the First Circuit remarked in a similar context:

> To read anything more into this phrase . . . would be to avoid the plain meaning doctrine altogether. Had [the defendant] wished to do so, it easily could have written into the Plan the . . . policy it now seeks to employ.

*Bellino,* 944 F.2d at 32. The paragraph is unambiguous: the "ten year" *post-retirement* option could be chosen with an effective date at any time between the date the employee chose the option and the day the benefits began to be paid. It did not depend on the choice of an effective date after the employee's retirement date.

Viewing the "effective date" language in the context of the paragraph as a whole forecloses any remaining doubt that the Article Six to which DeSieno's form referred described a pension, not a death benefit. Most simply, the paragraph begins by repeating the description of the "ten year certain and continuous" 10CC option contained

in the form DeSieno had signed: it allowed for payments to a beneficiary if the employee died before receiving 120 "retirement annuity" payments. There is no conceivable way to read this provision as referring to preretirement death benefits, first, because the paragraph specifically refers to a *"retirement* annuity," and second, because it refers twice to payments being made *to the employee until her death.*[6] Payments made until death cannot, by definition, be death benefits.

This clear picture of a pension option is nowhere contradicted in the paragraph, let alone by the specific rule Van Kampen propounds. It is suggested that the employee will exercise this pension option prior to retirement: one condition for choosing it is that the retirement annuity has not yet begun to accrue, that is, that the employee *has not yet retired.* It is also suggested that the effective date chosen can be a pre-retirement one, otherwise it would make little sense to consider, as the second sentence of the second paragraph does, the impact of an effective date before the retirement benefits have begun to accrue, that is, before retirement ("If such member ... dies after the effective date and before his retirement annuity begins to accrue ....").

Finally, and equally compellingly, it would be highly misleading, to say the least, if a paragraph sprinkled with numerous references to the effective date chosen by the employee nowhere mentioned the most important purpose of the effective date, namely, that it determined whether the option applied to retirement or pre-retirement death benefits. Only one sentence suggests that the retirement date might make the employee's election without effect, the sentence that states that the employee's death prior to the effective date voids the election. This would be the obvious and logical place to state, as well, that the choice of a pre-retirement effective date converted the option into a death benefit option only.

Nor is Van Kampen's description of the impact of the effective date revealed anywhere else in Article Six, indeed, anywhere in the entire Plan. As set out above, the first section of Article Six told DeSieno that she would receive her pension benefits in the form of a single life annuity to cease upon her death, unless she elected in writing to receive them in another form. Article 6 ¶ A(3). She made such an election in writing in March 1981. As to when that election had to be made, the paragraph stated only that it had to be made prior to the time the benefits began to accrue, which it was, and subject to any other time limits specified in the Plan. A perusal of the Plan would have revealed no other relevant time limit. The "Election of Benefits" section of Article Six would have confirmed DeSieno's belief that her 1981 election remained valid until revoked. Nor can Van Kampen's rule be found anywhere else in the Plan, which this Court has read in its entirety.

Thus, an exhaustive review of the Plan documents reveals no support for Van Kampen's assertion that the type of benefit chosen turned on the effective date. His assertion can therefore only be seen as evidence— whether of his personal understanding or of American Home company practice—extrinsic to the Plan. Because my review of the plan language finds no ambiguity—except that created by the extrinsic assertion itself—Van Kampen's unsupported assertion is irrelevant here and must be disregarded. *Bellino,* 944 F.2d at 32.

Without Van Kampen's explanation of the importance of the effective date on the 1981 form, the defendant's case collapses. What the record then shows is that DeSieno elected the "ten year" Option on a form that unambiguously and on its face described a post-retirement pension plan. That form incorporated by reference Plan documents that were equally unambiguous in describing a post-retirement benefit. The effective date DeSieno chose was within the deadlines required by the Plan documents themselves, documents, once again, describing a post-retirement option. DeSieno never revoked

---

**6.** "[A] member or former member ... may exercise the option to convert the retirement annuity otherwise payable to him after retirement into reduced annuities ... *payable to him until his* *death* and thereafter, in the event that he has died ... *before he has received* one hundred twenty (120) monthly payments after the effective date ...."

the option she had selected in 1981. By the terms of the Plan, an option validly chosen and never revoked or canceled in writing remained in effect. Van Kampen's interpretation of that option, based on its effective date, cannot operate to contradict the unambiguous language of the Plan itself. 29 U.S.C. § 1104(A)(1)(D); *Recupero,* 118 F.3d at 827; *Bellino,* 944 F.2d at 30.

### C. *Fiduciary Duties Towards DeSieno*

■ Although the plain language of the Plan itself determines the result in this case, that result is reinforced by viewing the defendant's actions in the context of its fiduciary duties towards DeSieno. In communicating with DeSieno about the terms of her pension plan and the benefits she should expect to receive, the defendant was exercising an administrative, and therefore fiduciary, function. *See Varity Corp. v. Howe,* 516 U.S. 489, 502–03, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). It is a function it has performed in an extremely misleading fashion. Although Louis DeSieno has not brought a claim for breach of fiduciary duties in this case, the actions of American Cyanamid and American Home here are nonetheless troubling when viewed in the context of a benefit plan's duties towards its beneficiaries.

Presuming that Van Kampen's interpretation of the impact of the effective date was already American Home policy in 1981, that policy was apparently being implemented without any notice to the employees. Even if DeSieno had carefully read the form she signed, the Article Six to which it referred her, and then the rest of the Plan, she would have found nothing to suggest that the election she had made was, merely on the basis of the effective date she had chosen, not the pension benefit option it purported to be. Nor would she have learned of it from the explanatory document she was actually given by American Home,[7] the Summary Plan Description. In the section covering the "ten year" *pension* benefit, the Summary instructed employees to specify an effective date for the "ten year" option as "the first day of *any* month following the date of your election, but not later than the date your pension starts."

It did not say: "the first day of any month following your retirement date."

But American Home went beyond providing generalized Plan documents that gave no indication of the important effective date rule it now propounds. It also provided individualized benefit documents directly to DeSieno. A reasonable reading of these documents would have reinforced the impression made by the 1981 form and the Plan instruments, namely, that DeSieno had selected a pension option.

The defendant characterizes the American Cyanamid form given to DeSieno on January 26, 1989, as referring to a "pre-retirement option" when it reported *"MEMBER HAS CURRENTLY EXERCISED:* 10CC Option–Son." This simply ignores the heading on the form, on which any literate employee would be entitled to rely: *"Pension* Estimate for M. DeSieno." (emphasis added). It also ignores the fact that the form referred to a maximum amount payable to DeSieno herself should she choose no survivor option—an irrelevant piece of information if the form referred only, as he claims, to pre-retirement death benefits.

The documents DeSieno received when she left American Home in 1990 were less explicit, yet, read in the context of DeSieno's interactions with the benefit plan until that time, they would have confirmed her conviction that she was registered for the "ten year" pension option. The January 23, 1990, form letter that informed her of her benefit options confirmed that her monthly annuity would be $379.00, the same amount shown on the 1989 form that listed her as having chosen the "ten year" *pension* option for her son. The literature attached to the letter on the "surviving benefit options" included a description of the "ten year" option identical to the one contained on the form DeSieno had filled out in 1981.

The January 23 letter's final statement, "Before your pension payments begin, you will be given another opportunity to elect a postdraw survivor option" could not be expected to indicate that any prior options had automatically been invalidated. Indeed, it

---

7. Van Kampen Aff. ¶¶ 15–16.

would be inconsistent with Van Kampen's interpretation of the effective date had it done so. Van Kampen has suggested that if DeSieno had selected a later effective date, she would already have had a "ten year" pension option in place. A form letter instructing all employees that they must, at the point of retirement, reselect any survivor options would be incorrect; by the Plan's own terms, those who had already made a "ten year" pension selection would be bound to it unless they revoked it in writing. There is simply no way to make this form letter compatible with any comprehensible notification to both classes of employees described by Van Kampen, those who had filled out a "ten year" "pension" form that in fact expired on retirement, and those who had filled out the same form, but with a different date, and were bound to it unless they revoked it in writing.

The final correspondence between DeSieno and American Home only adds to the confusion, a confusion which DeSieno should only be reasonably expected to resolve in line with the earlier, unambiguous documents clearly informing her that she had selected a pension benefit option, not a death benefit. "You have selected the option," the letter reassured her.

## IV. *CONCLUSION*

Because the defendant's plan administrator's interpretation of the ERISA plan documents that govern this case conflicts with the plain language of the Plan itself, I find that interpretation arbitrary and capricious. I am also deeply troubled by the record of correspondence between the plaintiff's mother, the Plan beneficiary, and the Plan. Any reasonable reading of that correspondence would have reinforced the language of the Plan documents themselves, namely, that De-Sieno had chosen a pension option that would pay an annuity to her son following her death. If American Cyanamid in fact had the policy it now puts forth—making the nature of the "ten year" option depend on the specified effective date—it had a fiduciary duty to convey that policy to its employees in some clear manner. The record before me suggests it did no such thing.

For the foregoing reasons, the plaintiff's motion for summary judgment (docket # 9) is **ALLOWED**. The defendant's motion for summary judgment (docket # 12) is **DENIED**. Plaintiff is to submit a proposed form of judgment forthwith.

**SO ORDERED.**